[Civ. No. 7871. Third Dist. Aug. 16, 1951.]

Guardianship of the Persons and Estates of BRENDA LEE CASAD et al., Minors. RALEIGH CASAD, Respondent, v. ELOISE WILSON, Appellant.

David E. Peckinpah and Louis W. Caporale, Jr., for Appellant.

C. Ray Robinson and V. G. Preston for Respondent.

DEIRUP, J., pro tem.—Brenda Lee Casad and Glenda Eloise Casad are the children of the appellant, Mrs. Eloise Wilson, and Glen R. Casad, who died on July 10, 1949. Upon the death of their father the children became entitled to proceeds from a life insurance policy amounting to approximately $3,000. Their grandfather, the respondent, applied

for guardianship of their persons and estates. His application was opposed by the appellant. After a trial an order was entered appointing the respondent guardian, from which this appeal has been taken.

The children were born in 1939 and 1941 and were 10 and 8 years of age at the time of the trial. In 1943 Glen R. Casad entered the armed services of the United States. He left his wife and children with his father, the respondent, and his mother, now deceased. Their home was in the suburbs of Merced and was spacious and comfortable. Appellant, however, preferred to live in town, and moved into an apartment, the rent of which was paid by the respondent. There she entertained service men to a considerable extent. There was no proof that she had improper sexual relations with any of them excepting Charles J. Wilson, to whom she is now married. She and Wilson had an affair, commencing in 1944, in which there were numerous acts of sexual intercourse. Glen R. Casad secured an interlocutory decree of divorce on February 8, 1945. By a property settlement agreement which was incorporated in the decree the custody of the children was awarded to their father for 30 days and then to appellant if she secured a proper home, with an allowance of $75 a month. In July the order was modified to give the father custody. Appellant did not find a home. On the contrary, immediately after the interlocutory decree she went to Kingman, Arizona, to join Charles J. Wilson, her lover, and lived with him there and in other parts of the United States as his wife from then on. In June, 1945, she and Wilson had a marriage ceremony performed in Mexico. There was no other marriage until July 19, 1949, after the death of Glen R. Casad. A son was born to them in December, 1945.

There was evidence that appellant neglected the children while she had them. On one or more occasions the children were found playing about in their nightgowns late in the morning, finding their own breakfast. One of them developed eczema, probably due to malnutrition. After she deserted them she sent them a few gifts, but she did not write to them or inquire about them excepting for one letter to the respondent, which he did not answer. In August, 1948, she returned to California and in October Wilson secured a position as a watchmaker in Visalia. Between August and December appellant saw her children briefly a few times, but made no further attempt to do so until after the death of Glen R. Casad in July, 1949. Then she could only look at

them, for they were under quarantine. She made no further efforts to see them up to the time of the trial.

Glen R. Casad was married in 1948, but the children lived with the respondent nearly all of the time after the appellant left them, this being more than half their lives. They are well adjusted and happy and want to remain with the respondent. Appellant and her present husband, whom she married on July 18, 1949, have a three-room house in Visalia and are planning to build another room. His salary is $300 a month. Friends and neighbors testified that she and her husband are happy together and that she takes excellent care of their little son.

Findings of fact were filed in the guardianship proceedings in which the court found that appellant was unfit to have the custody of the children.

At the trial counsel for appellant objected to the introduction of the greater part of the evidence that we have referred to as being too remote. They call attention to the rule that the question is always one of present fitness, and cite *Guardianship of Jones,* 86 Cal.App.2d 35 [194 P.2d 141], and *Ott* v. *Ott,* 127 Cal.App. 322 [15 P.2d 896], as holding that past misconduct is immaterial unless it bears directly upon present fitness. There is no question at all but that where the issue of fitness is involved it is one of present fitness. *In re Green,* 192 Cal. 714 [221 P. 903] ; *Munson* v. *Munson,* 27 Cal.2d 659 [166 P.2d 268] ; *Prouty* v. *Prouty,* 16 Cal.2d 190 [105 P.2d 295]), but the cases cited by counsel hold only that the trial court has wide discretion in rejecting or admitting evidence as being or not being too remote to have value as bearing upon the issue of fitness.

The evidence in this case was admissible as bearing on the present character of the appellant, and warranted the court in finding the appellant to be unfit to have the custody of the children. Appellant has a home, and with the help of the estate of the children is able to support them for a period of time, at least. But more than that is implied in the term "fitness." To be fit to raise children a mother should have character, so that she can train them to be moral and normal persons. She should also have mother love, not as a mere sentiment, but as a compelling force. It is true that moral lapses should not be deemed conclusive. They often occur without seriously interfering with parental care. But it does not occur often that a mother deserts her children to join her lover and stays away from them for years. We use the

word "desert" instead of "abandon" because the latter term implies an intent never to have anything to do with a child again, and appellant did no doubt hope that some day, when it became convenient to her, she would get them back. The fact is that her character was such since 1945 that she could desert them and feel very little interest in them for years and that she could live with Wilson and bear and raise another child without the benefit of marriage, and violate all the laws and customs that forbid such a relationship. The trial judge had the opportunity to observe appellant on the witness stand and appraise her character better than we can from a written record, but even in the record there are indications of flippancy and lack of moral stamina. Her testimony indicated that she felt no remorse for what she had done to her children when she deserted them. She said that in 1944 she was 26 years old and could do as she pleased, apparently in justification of her conduct; that her attorney told her after the interlocutory decree was entered that she was as free as the birds; that she thought that the Mexican marriage was valid— also that she had the impression that a final decree of divorce was necessary before she could marry again. She threw her children away once in pursuit of romance; we can have no assurance that she would not do so again. We do not know why she wants the children now. No doubt there is a residuum of mother love. It cannot be very great since it did not prevent her from deserting the children in the first place or cause her to insist upon her legal right of visitation after she came back to California. Perhaps she would like to get the insurance money; and the little girls might be useful to her in taking care of her little boy. And there is such a thing as saving face.

In our opinion the evidence amply sustains the order of the trial court. However, appellant insists that the trial judge, by the remarks he made after the hearing and by his conclusion of law, "That it is for the best interests and welfare of said minors, and each of them, that the said Raleigh Casad be appointed guardian of the persons and estates of said minors, and each of them" indicated that he took into account the welfare of the children and that this is contrary to established law.

The remarks of the trial judge to which exception is taken, are as follows:

". . . I simply have to look at all the evidence and see what I think is best for these two children.

"If there had been a jury of twelve sitting to my right and heard the evidence, the only conclusion that they could have arrived at is that with Mr. Casad, the grandfather of the children, the children are surely safe; that with their mother they might be safe and again they might go the ways they should not go. That is all that a Judge can do, just take the whole picture and arrive at an unanimous conviction and I am not to take an uncertainty for a certainty."

Insofar as the statements made by the trial judge are concerned we must apply the rule that remarks which are made during or at the end of the trial cannot be used to impeach the findings of the court. Such remarks are made without a full consideration of all of the aspects of the case, and it must be presumed that the judge, in signing the findings, had the law in mind. However, in the present case, what the judge said was that he doubted that the children would be safe in the custody of their mother. If they might be unsafe, the mother was unfit.

The conclusion of law of the trial court was strictly in accord with the first sentence in section 1406 of the Probate Code.

The Probate Code lays down the following rules for the appointment of guardians:

1406. "In appointing a general guardian of a minor, the court is to be guided by what appears to be for the best interest of the child in respect to its temporal and mental and moral welfare; and if the child is of sufficient age to form an intelligent preference, the court may consider that preference in determining the question. If the child resides in this state and is over fourteen years of age, he may nominate his own guardian, either of his own accord or within ten days after being duly cited by the court; and such nominee must be appointed if approved by the court. When a guardian has been appointed for a minor under fourteen years of age, the minor, at any time after he attains that age, may nominate his own guardian, subject to the approval of the court."

1407. "Of persons equally entitled in other respects to the guardianship of a minor, preference is to be given as follows:

"(1) To a parent;

"(2) To one who was indicated by the wishes of a deceased parent;

"(3) To one who already stands in the position of a trustee of a fund to be applied to the child's support;

"(4) To a relative;

"(5) If the child has already been declared to be a ward of the juvenile court, to the probation officer of said court."

1408. "As between parents claiming the guardianship adversely to each other, neither is entitled to priority; but other things being equal, if the child is of tender years, it should be given to the mother; if it is of an age to require education and preparation for labor and business, then to the father."

1409. "A parent who knowingly or wilfully abandons or, having the ability so to do, fails to maintain his minor child under fourteen years of age, forfeits all right to the guardianship of such child; and a parent or guardian who knowingly permits his child or ward to remain for one year in an orphan asylum· where the child is supported by charity, without notifying the managers or officers of the asylum that he is such parent or guardian, abandons and forever forfeits all right to the guardianship of·the child. The officers and managers of any orphan asylum having such abandoned child in its care have the preferred right to the guardianship of the child."

These sections were enacted in 1931. Insofar as they are of interest in this case they are based on sections 1751 of the Code of Civil Procedure and 246 of the Civil Code, which were repealed. There were changes in the wording of the statute which indicated purposeful study by the Legislature and the provision in section 246 which made it applicable to custody proceedings as well as to guardianship was eliminated. However, a most significant change was made in that the first sentence in section 1751 was left out. That section, with the eliminated portion emphasized, read as follows:

1751. *"The father or the mother of a minor child under the age of fourteen years, if found by the court competent to discharge the duties of guardianship, is entitled to be appointed a guardian of such minor child, in preference to any other person.* The person nominated by a minor of the age of fourteen years as his guardian, whether married or unmarried, may, if found by the court competent to discharge the duties of guardianship, be appointed as such guardian. The authority of a guardian is not extinguished nor affected by the marriage of the guardian."

Appellant insists that it is an established rule in this state that the welfare of a child under the age of 14 can never be considered at all by the court in a contest between a parent and any other person for guardianship unless the parent is found to be unfit. It is not necessary to discuss this point,

for the trial court properly found the parent to be unfit. But the rule as stated in its bald form, applicable in *all* cases where the child is less than 14 years old, is certain to do terrible injury to children in many cases, and therefore the question whether the rule has not been relaxed by the statutory change in 1931 should be discussed.

The rule in its absolute form is laid down in an illuminating and well reasoned opinion in *In re Campbell*, 130 Cal. 380 [62 P. 613]. We quote from pages 382 and 383:

"Under the general law, and independently of the provisions of the codes, the father has a natural right to the care and custody of his child (2 Kent's Commentaries, 205; Schouler on Domestic Relations, secs. 245-58); and this right is recognized by the provisions of our codes (Civ. Code, sec. 197; Code Civ. Proc. sec. 1751); which are to be regarded as but a re-expression of the principles of the common law governing the subject. (Civ. Code sec. 5). The father's right, at least so far as the services of the child are concerned, is strictly a property right, for the loss of which—as in the case of servants generally—an action could at common law be maintained; and in other respects the right, though not commonly spoken of as such, is of essentially the same nature as the right of property. For though the subject of the right is not salable, it is valuable, and of all species of property the most valuable to the parent. Hence it is a mistake to suppose that the right of the father is merely fiduciary. It is that; but it is also—like the right of the child in the father— a right vested in him for his own benefit, and of which it would be a personal injury to deprive him. The right must therefore be regarded as coming within the reason, if not within the strict letter, of the constitutional provisions for the protection of property. (Beatty, C. J. in *Ex parte Miller*, 109 Cal. [643], 662 [42 P. 428].)

"The father's right is, however, coupled with the obligation to support and educate the child (Civ. Code sec. 196), and is also qualified and strictly limited by the fact that the child itself is a human being, and as such vested with rights for which it is entitled to protection. Hence it is the clear right and duty of the state, to the extent the protection of the child may require to control and limit, and under certain circumstances to terminate, the right of the father. Accordingly, independently of numerous statutory enactments, courts of equity have always, by the appointment of guardians and otherwise, exercised a liberal jurisdiction over the

persons and estates of minors; and this jurisdiction may be said to be limited only by the principle on which it rests—namely, the necessity of protecting the rights of the child.

"But the question here does not relate to the general right of the state, as exercised by the English court of chancery or courts of equity in this country, but to the special powers conferred by the codes on the superior court for the appointment of guardians. These do not purport to confer upon the superior court, acting in the special proceeding, all the powers hitherto exercised by courts of equity, but only the power to appoint guardians in certain cases (Code Civ. Proc., sec. 1747), and under certain conditions (Code Civ. Proc., sec. 1751); and the case is therefore to be determined by these provisions. By the former section the power of the court to appoint guardians is limited to the case 'of minors who have no guardian legally appointed by will or deed'; and the same limitation is prescribed by section 243 of the Civil Code, and section 241 therein cited. In the latter section the power of the parent to dispose of the custody of the child by will or deed is expressly recognized; and this must be taken as a recognition of the general right of the parent to dispose of the custody of the child, of which it is but a special example. For it would be unreasonable to suppose that the legislature intended to limit or restrict a right, universally recognized in our own and all systems of law, to the single case provided for; which must therefore be regarded simply as an application of the recognized principle.

"Accordingly, by the provisions of section 1751 of the Code of Civil Procedure, it is made the duty of the court to appoint the father or mother of the minor, 'if found by the court competent to discharge the duties of guardianship.' But under this provision, and under the general law, the prima facie presumption is that the parent is competent; and hence the court is not authorized to appoint another as guardian, unless it finds to the contrary. Hence the section is to be construed as if it read that the father or mother is to be appointed 'if not found by the court incompetent', etc. The fact of the competency or incompetency of the father was, therefore, the controlling question in this case; and as there is no finding on the point, the findings must be regarded as insufficient to support the order appealed from."

It will be noted that the rule is based on the part of section 1751 of the Code of Civil Procedure which was repealed in

1931. and not reenacted. That decision and that statute were cited in nearly every case prior to 1931 in which a contest for guardianship between a parent and a stranger, such as a grandparent, was involved. *In re Campbell* has been cited in opinions since 1931. Yet that decision, insofar as it is founded on a statute which no longer exists, has no authoritative force.

It is pointed out in the decision that at common law the parent owned the child virtually as a chattel; that courts of chancery protected the rights of the child as a human being; but that in this state the superior court was not given the equitable jurisdiction of the chancery courts which courts in other states have. It is interesting to note that, though the common law we adopted included equity, the Legislature chose to abrogate the equitable principle which protected the child when the parent was remiss in the performance of his obligations toward the child.

It happens frequently that a parent leaves a young child with a relative for years. He pays very little attention to it, does virtually nothing toward helping and encouraging it and giving it the feeling of security that a child has to have in order to develop normally. As a rule he does not even contribute toward its support. Then, when it becomes convenient to him, he demands the child as his property. To the child he is a stranger. The foster parent is, to the child, the true parent. In the parent's home there may be a wife with children of her own whom she is bound to favor. The emotional shock to the child is certain to be profound and is likely to be extremely damaging, especially in the complicated society we have today. Yet it has been held that if the parent has a decent home and a fair income and if he is a fairly respectable person, the courts are powerless to prevent him from reclaiming the child. (*Estate of Akers,* 184 Cal. 514 [194 P. 706]; *Guardianship of Snowball,* 156 Cal. 240 [104 P. 444]; *In re Green,* 192 Cal. 714 [221 P. 903]; *Guardianship of Mathews,* 169 Cal. 26 [145 P. 503].)

In a few cases the appellate courts have said that the child is not a chattel and that its interests are of primary importance. (*Guardianship of Imperatrice,* 182 Cal. 355 [188 P. 48]; *Guardianship of Hawkins,* 183 Cal. 568 [192 P. 30]; *In re Johnson,* 101 Cal.App. 110 [281 P. 435]; *Matter of Lee,* 165 Cal. 279 [131 P. 749, 45 L.R.A.N.S. 91].) But these are minority cases which follow the rule which prevails in most of the other jurisdictions. (39 C.J.S. 32; 33 Cal.L.Rev. 306.)

The equitable rule is illustrated in the decision in *In re*

*Bock,* 280 N. Y. 349 [21 N.E.2d 186]. In that case the order of the Surrogate's Court awarding guardianship to a paternal uncle as against the claim of their mother was affirmed. One of the minors was more than 14 years old, the other two were under 14. It is said in the opinion:

"... While it is true that, prima facie, a surviving parent has a right to the guardianship of the children, particularly when they are of tender age, yet under all the circumstances the chief consideration must always be what will promote the best welfare of the children. While the circumstances of a particular case must be strong in order to overcome the so-called paramount right of the parent, yet where the circumstances of a particular case contain such evidence, the best interests of the infants must be the guiding principle. The surroundings and associations of the young have so great an effect upon their outlook and so form the basis of their future development that nothing should prevent the courts from considering the human aspects of the question presented.

"In the case at bar it appears that, owing to the divorce between the parents and the remarriage of the mother, the children have been separated from the mother almost completely for about four years. The oldest child, who testified, exhibited a feeling of antagonism and a distinct aversion to his mother and stepfather. This can be gleaned even from a reading of his printed testimony. The Surrogate examined in private the other two children to learn their wishes. To force these children into an environment to which they are so strongly opposed in any event would be unpleasant and might be attended by very serious results to their development. Then, too, there is the breakup in the continuity of the schooling which they have had in Bronxville. In order to avoid this break their paternal uncle is willing to change his home to Bronxville.

"We reach the conclusion, therefore, that the Surrogate was not without power to appoint the paternal uncle, Hans Breitung, guardian of the person as well as of the property, even though no fault or moral turpitude was shown on the part of the mother."

In *Perry* v. *Perry,* 278 Mass. 601 [180 N.E. 512], the father was denied custody of a 9-year-old son who had lived all his life with a grandmother. It is said that the right of the parent is not absolute, there being "no express or implied requirement that the parents must be found unequivocally to be

unfit before the custody of the child can be awarded to some suitable third person.''

There are in the United States two conflicting rules that bear upon this subject. One of them is illustrated by the decisions in this state and in a relatively small number of other states, and may be called the common law rule because it eliminates the chancery rule of the English courts. The other rule may be called the equitable rule, for it includes the rule of the chancery courts that the welfare of the child is of paramount importance, as is pointed out in the quotation from *In re Campbell, supra*. This rule is illustrated by the decisions in New York and Massachusetts from which we have quoted.

We derived the rule that has been applied in this state from two sources. A guardianship law was enacted April 19, 1850. (Stats. 1850-53, ch. 115.) In section 5 it is provided that:

''The father of the minor, if living, and in case of his decease the mother while she remains unmarried, being themselves respectively competent to transact their own business, and not otherwise unsuitable, shall be entitled to the guardianship of the minor.''

It is provided further that a minor over the age of 14 years may nominate a guardian and that a minor under that age may nominate a guardian after he reaches the age of 14, much as in our present law.

Upon the adoption of the codes in 1872 the old guardianship law was made the basis of the provisions in the Code of Civil Procedure, including section 1751. Nowhere in that law is the welfare of the child referred to. At the same time the Legislature enacted section 246 of the Civil Code, the provisions of which will now be found in sections 1406 and 1407 of the Probate Code. These provisions were based on Field's Draft, New York Civil Code, section 127. (1923 Civ. Code, § 246.) It will be noted that section 246 expressed the equitable rule in that it made the welfare of the child of the primary consideration. Its terms were inconsistent with the provisions of section 1751 of the Code of Civil Procedure. The welfare of the child was to be the guide for the court and the child was entitled to express a preference if old enough to form an intelligent one in all cases and regardless of its age. The parent had a preference as against other persons equally entitled, while in section 1751 he was given a preference as against every other person, if he was competent. This

gave him an absolute right instead of merely a preferential right.

Thus until 1931 we had the common law right of the parent under section 1751 and the equitable right of the child under section 246. The common law right in section 1751 was more definite and therefore had the effect of excluding all children under 14 from the rights given by section 246. That provision in the law has been repealed. Nowhere in the statutes is there any distinction between a child of 13 and one of 14, other than that the one who is 14 years old may nominate a guardian. There is no reference anywhere to the parent being "competent" or "unfit." Incidentally, the latter word never did appear in the statutes.

It appears therefore that since 1931 we have had the equitable rule exclusively and the common law rule has been abolished by statute. The rule that has been followed, on the whole, by the courts never was the common law that we got from England for it included the jurisdiction of the chancery courts (5 Cal.Jur. 252), which, as pointed out in *In re Campbell, supra,* applied the equitable rule. Our rule, insofar as it was what has been called the common law rule, was a statutory rule. The fact that the statute has been repealed indicates that it was the intention of the Legislature to abolish the rule insofar as it was based on the statute. The fact that the Legislature repealed the statute which gave to the parent an exclusive preference leads to the conclusion that the Legislature intended that the parent should *not* have any preference other than that also given by section 246 of the Civil Code and that the equitable rule should be binding on the courts.

The quotations from *In re Bock, supra,* and *Perry* v. *Perry, supra,* indicate the attitude of the courts that apply the equitable rule, which is now the statutory rule in California. To illustrate the attitude of our courts, following the common law rule, we refer again to *Estate of Akers,* 184 Cal. 514 [194 P. 706]. In that case the mother had been away from the child for four years. There were charges of abandonment and immorality but they had not been proven. The child was 7 years old and had been cared for by one Mrs. Shreve with whom it had been placed by its father. That case was similar to the one we now have in respect to the fact that the child was of about the age of the Casad children and had been deserted by its mother and was a member of another family. It was dissimilar in that the mother in that case was not found to be unfit upon sufficient evidence while

in this case she was. It was similar in that the trial judge was interested in the welfare of the child. For that reason we quote from the opinion at length at page 522, with emphasis added:

"The record reveals that the trial court made the order appealed from largely, if not entirely, upon the theory that 'the only purpose in an inquiry of this kind is to determine what is best to be done with the child for its own welfare, and the question as to the character and reputation, fitness or unfitness, of the mother in a case of this kind, seems to me to be not the most important one.' That this was the attitude of the trial court is evidenced by the further statement: 'I don't know of any higher law than that this child be cared for and that it be in the custody of people who are able and willing to support it, and that they have done that and shown that for these four years.' It is now insisted by counsel for respondent that, regardless of the erroneous admission of palpably prejudicial evidence and apart from the question of the insufficiency of the evidence to support a finding of abandonment, the order appealed from should be affirmed upon the theory indicated and adopted by the trial court. *This we cannot do, because it is the settled rule of law in this state that the care, custody, and control of a minor child under the age of fourteen years must be committed to its parents, rather than to strangers, unless it be shown and found that the parent is unfit to perform the duties imposed by the relation or has, by abandonment of the child, forfeited the natural right to its custody. In short, in a contest for guardianship, as here, between a parent of a child and a stranger to the child, the paramount question is the competency of the parent to act as guardian, and, in the absence of a justifiable finding of the parent's incompetency, the court must appoint the parent as guardian despite the fact that the material welfare of the child may perchance be enhanced by committing its care and custody to another person.* (Code Civ. Proc., sec. 1751; Civ. Code, sec. 246, subds. 3, 4; *In re Campbell*, 130 Cal. 380 [62 P. 613] . . .)"

Other cases are cited, but they, too, are based on the repealed sections of the codes and the decision in *In re Campbell, supra.*

As has been pointed out, in a few cases the writers of the decisions have refused to accept the principle that the court may not consider the best interest of the child, but in most of the decisions it is frankly asserted that the court lacks discretion to do so if the parent is fit and has not abandoned

the child. Thus in *In re Green, supra,* though it appeared that the child had been raised by a half sister of the mother from infancy and had been given a happy home as one of her children for 13 years and that the child was fond of her, it was held that the court had no discretion other than to give it to its mother. Probably it was to prevent just such an abuse of the rights of a child that the statute upon which all of the decisions prior to 1931 were based was stricken from the statute books.

The court before 1931 was under mandate not to consider the best interest of a child under the age of 14 if a parent applied for guardianship or custody as against a stranger unless the parent was found to be incompetent. The court is now under statutory mandate to be guided by "what appears to be for the best interest of the child in respect to its temporal and mental and moral welfare" in every case, without exception.

We have, of course, the statutory preferences in section 1407 of the Probate Code. This statute applies to children of every age. It has been said that the preference which is given to the parent is equivalent to the exclusive right specified in former section 1751 of the Code of Civil Procedure. But this interpretation contradicts the terms used. The statute implies that another person may be equally entitled (1) with the parent, or (2) with one who was indicated by the wishes of a deceased parent, or (3) with a trustee, or (4) with a relative or (5) with the probation officer, or may be better entitled. Having in mind the law that the welfare of the child is the primary consideration, it would seem that a stranger who had served as a parent for years might well have a better right than either the parent who had shunted his duty toward the child or any of the other persons who are given priority rights. Clearly the preference that is given to a relative would not be absolute. If the relative were an entire stranger to the child he could not successfully claim a right equal to that of a foster parent who had raised the child. A court could not justly break up the true family of the child solely because of blood relationship.

On the other hand the preferences which are given by section 1407 of the Probate Code are of importance and cannot arbitrarily be ignored by the trial court without an abuse of discretion. They are natural preferences which should guide the court even if they were not inserted into the statute for its guidance. Especially in the case of the preference in

favor of a parent a complex of factors must be considered by the court. One is that the intimate relationship between a parent and a child is of great importance to both. The emotional ties cannot be disrupted without danger of serious psychological damage to both parent and child. The parent has the legal right to custody and to the earnings of the child. The family is important in our system; it is often called the social unit. In the ordinary family the parent has legal and moral rights. But the parent has legal and moral obligations toward the child which are based on considerations of the welfare of the child, and during this century it is the welfare of the child that has received increasing emphasis. For example, the parent is required to send the child to school, though this limits the right to services and earnings. For the protection of the child we have developed the juvenile court system. A parent who is guilty of neglect may be deprived of the custody of the child and a year later he may be deprived completely of all parental rights. (Welf. & Inst. Code, §§ 700, 701.) Thus desertion and abandonment may have the same effect in law as they have in fact, insofar as the child is concerned. The writer of this opinion thinks that the repeal of the statute upon which the common law rule was based and the restoration to the courts of the right to ensure the welfare of the child is in line with the purpose of the juvenile court law, so that if a parent has ceased to serve as such long enough to permit the child to become an integral member of another family in which it thrives and is happy, the child does not necessarily have to be given back to the parent and placed in an alien family. After the parent has broken the home of the child once, the court should not be compelled by an ancient law to break its home again against its will, and to its probable detriment.

It has been necessary to argue this point at length because there has been an obvious failure on the part of the appellate courts in their decisions after 1931 to realize the effect of the repeal of the statute upon which our common law rule was based. The first case in which the principle is discussed is *Stever* v. *Stever*, 6 Cal.2d 166 [56 P.2d 1229]. The trial court, in a divorce action, had awarded a child to the parents of one of the parties without any finding as to the unfitness of the parents. The case was decided in 1936, but it is apparent from the opinion that the changes in section 246 of the Civil Code and section 1751 of the Code of Civil Procedure in the transfer of their provisions to the Probate Code were not

brought to the attention of the court. The court applied the rule that had been laid down in the earlier decisions in guardianship matters, including *In re Campbell, supra*, in which the courts had held that they were bound by the terms of section 1751, and *Newby* v. *Newby*, 55 Cal.App. 114 [202 P. 891], in which the guardianship rule was applied to custody cases. The court relied on *Guardianship of Mathews, supra*. In the opinion in that case, at page 27, it is said:

"It is well settled that, under the provisions of Section 1751 of the Code of Civil Procedure, the father or mother of a minor child under the age of fourteen years, if found by the court competent to discharge the duties of guardianship, is entitled to be appointed guardian in preference to any other person, and that the court must appoint a parent seeking to be appointed, unless it finds such parent incompetent, notwithstanding the judge is of the opinion that the child's health and welfare may be promoted by giving it to another."

In *Roche* v. *Roche*, 25 Cal.2d 141 [152 P.2d 999], the same question arose and *Stever* v. *Stever, supra*, and *Guardianship of Mathews, supra*, are cited with approval. The opinion also quotes with approval from *In re White*, 54 Cal.App.2d 637, 640 [129 P.2d 706], to the effect that the right of a parent to the custody of a minor child "can only be forfeited by a parent upon proof that the parent is unfit to have such care and custody." In a dissenting opinion Mr. Justice Schauer suggests that *In re Campbell, supra*, the leading case upon the subject, and the cases which rely on it, should be disapproved, in that the child is regarded "somewhat as a chattel and the property interest therein of the parent is made paramount to the best interests of the child." He overlooked the fact that the decision in *In re Campbell* was only that the courts were, by section 1751 of the Code of Civil Procedure, deprived of jurisdiction to make the equitable rights of the child as a human being superior to the property rights of a parent who had violated his obligations toward the child. It follows that there is no need for disapproving the rule stated in that case. It has been disapproved by the Legislature in the repeal of section 1751. The opinion is merely an interesting treatise on the subject of an obsolete law. However, the actual decision in that case could have been based on section 246 of the Civil Code, which gave to the parent a preferential right to custody subject to the welfare of the child. A father was contesting for the custody of a 2-year-old child as against its maternal grand-

parents. No question of violation of duty was involved nor of such neglect that the restoration of custody to the father would damage the child psychologically. Without finding that the parent had lost his preferential right because of his conduct, the court could not properly have deprived him of the right of custody. So in *Stever* v. *Stever, supra,* and *Roche* v. *Roche, supra,* it was not necessary for the Supreme Court to rely on the repealed statute or the cases in which its harsh terms were held binding. The preference given the parent by sections 1406 and 1407 of the Probate Code should require a finding by the trial court, based upon sufficient evidence, that the parent had, by his conduct, rendered himself relatively unfit to have the custody of the child, in view of obvious consideration of its welfare.

In *Roche* v. *Roche, supra,* decisions handed down by the District Courts of Appeal after 1931 are cited with approval. In *Eddlemon* v. *Eddlemon,* 27 Cal.App.2d 343 [80 P.2d 1009], involving a contest between a mother and a grandmother, the custody was awarded to the mother. There was no proof or finding of unfitness in the mother or of prejudice to the child. In *In re White, supra,* again there was no proof that the welfare of the child would be prejudiced by returning it to a parent after a separation of brief duration. In *Guardianship of McCoy,* 46 Cal.App.2d 494 [116 P.2d 103], the court found for the parent and there is nothing to indicate that the award was not for the best interests of the minor. *Juri* v. *Juri,* 61 Cal.App.2d 815 [143 P.2d 708], involved a contest between parents. In *Guardianship of De Ruff,* 38 Cal.App.2d 529 [101 P.2d 521], the award of guardianship of a child to the maternal grandmother rather than to the mother was reversed, there being no finding that the mother was unfit, or a finding of any other reason why she should not have custody.

In *Guardianship of Sloot,* 92 Cal.App.2d 296 [206 P.2d 862], there were no facts that indicated that the mother was not entitled to a preference in the appointment of a guardian of an infant child. The necessity of applying the old rule in its extreme form in all cases was denied in *Booth* v. *Booth,* 69 Cal.App.2d 496 [159 P.2d 93]; and in *Robertson* v. *Robertson,* 72 Cal.App.2d 129, 132 [164 P.2d 52], it is said that: "We do not construe said rule to mean that the only cases where the custody of a child may be lodged with a third person are those wherein it has been shown that the parent is unfit to discharge the trust." In *Becker* v. *Becker,* 94

Cal.App.2d 830 [211 P.2d 598], the court refused to discuss the effect of the repeal of section 1751 of the Code of Civil Procedure for the reason that, "since the repeal in 1931, the same rule has been consistently followed." And in *Shea* v. *Shea*, 100 Cal.App.2d 60, 66 [223 P.2d 32], it is said:

" . . . The presumption stressed by the courts that the best interests of the child in respect to its temporal, mental and moral welfare always can be subserved by giving its custody to a parent whom the court cannot or does not wish to declare unfit, is a fallacy, but one which, having been defined by the Supreme Court, we, as an intermediate court, are compelled to continue." In the opinion articles in 33 California Law Review 306 and 19 Southern California Law Review 72 are referred to as stating the "modern" rule that prevails in other jurisdictions.

The term "rule" is somewhat misleading. What we are concerned with is laws. We received as a part of the common law the law that courts of chancery would protect the child as against its parents if they were remiss in the performance of their obligations. It is pointed out in *In re Campbell, supra*, that our courts were deprived of that power by the provisions of section 1751 of the Code of Civil Procedure. What was before the court was the construction of a statute which ensured in the parent ownership of the child regardless of its welfare. Since then the appellate courts usually applied the statute literally, but they did not establish a "rule" which could survive the repeal of the statute. The courts could not by any number of decisions restore the statute which was repealed. It is true that the Supreme Court in *Stever* v. *Stever, supra,* and in *Roche* v. *Roche, supra,* overlooked the fact that the statute had been repealed and that the decisions in which the statute had been given effect mean no more than any authority does insofar as it construes an obsolete statute. This is an intermediate court and is bound by the Supreme Court decisions insofar as they hold that a child cannot be taken from the immediate custody of a parent without a finding that the parent is unfit. But the Supreme Court did not have before it a factual situation at all similar to the one in the present case. It did not decide that a parent may not become unfit to have the custody of a child because of desertion, if it appears clearly that the child would be better off in the home of a foster parent by whom it has been raised.

In the present case the appellant deserted the children for reasons of which they are no doubt aware. It was necessary

for them to become readjusted in the home of their grandparents. They have a comfortable home in which they are happy. They are hostile toward their mother and their stepfather and the little half brother. To force them to go into a crowded little house and live among strangers would involve a terrible psychological shock to them. Breaking the continuity of the emotional life of any child, other than an infant, is a serious thing; it is likely to cause very serious damage. It is so serious that the right kind of parent does not want to do it. If the appellant had been controlled by the real love that children need she would have kept in touch with them while she was away and when she returned she would have tried to make up to them for what she had done to them. She would not have sought to take them back until they wanted to come. The fact that she wished to force them into a damaging psychological environment, if she knew it, or the fact that she did not know it, should be taken as evidence of unfitness.

While we believe that the trial court was fully justified in finding the appellant to be unfit, yet the writer of this opinion feels that it is important that the law or rule which is applicable to cases of this sort be brought up to date. As in the juvenile court, the court should be guided by what appears to be for the best interest of the child in respect to its temporal and mental and moral welfare and its emotional and psychological environment. The trial judge knows very well that children should ordinarily be left with their parents. The trial judge sees the parents and the children with their faults and their virtues and can determine what should be done for the greatest good of all concerned. They are not fictional parents and children; they are human beings. Once in a while he will abuse his discretion and be reversed on appeal but on the whole he will be right. And the parent should not be encouraged to believe that he has a legal right to desert his child and serve no purpose in preparing it to meet the world successfully and happily and then, at his convenience, demand its custody against its will.

The judgment is affirmed.

VAN DYKE, J.—I concur in the affirmance of the judgment. I do so upon the ground stated in the forepart of the opinion of Justice pro tem. Deirup, that the trial court's finding appellant is unfit to act as guardian is supported by

substantial evidence and therefore is binding upon this court on appeal. That state of the record renders unnecessary that part of the opinion which discusses the soundness of the rule that before custody can be taken from or refused to a parent there must be a finding the parent is unfit to have it. After the statutory change pointed out had occurred, the rule was reaffirmed by the Supreme Court and is binding upon us. Any relaxation of the rule must come from that court or from the Legislature.

ADAMS, P. J.—I dissent.

In my opinion the trial court abused its discretion in making the paternal grandfather guardian of the persons of these little girls and refusing such guardianship to their mother.

The evidence shows that this grandfather was, at the time of the hearing in October, 1949, 64 years of age, and these children were 7 and 9 years old respectively. Their own grandmother, the former wife of Raleigh Casad, was dead, and a second wife, 58 years of age, had taken her place. The father of the children was also dead. There was no evidence that the mother of these girls was not at that time living a normal and respectable life with her husband and infant son, or that her home was not a fit place for her girls. The finding of unfitness of the mother was based solely upon alleged improper misconduct with her present husband which had begun some time prior to the divorce action instituted by her former husband, Glen Casad, and prior to the execution by the former spouses of an agreement dated February 8, 1945, which was incorporated into the interlocutory decree when a divorce was granted to Glen Casad on February 8, 1945. In said agreement it was recited that there was no community property and it was agreed that the husband should have the care and custody of the two children for 30 days, and that thereafter the wife should have such care and custody *provided* she had a proper and adequate home properly to care for said children, and that at such times as such home was not provided the husband should have such care and custody and provide such home. No alimony was provided for Mrs. Casad, but the husband agreed to pay to her $75 per month for the care of the children when in the wife's custody. Mrs. Casad was given nothing but the proceeds of the sale of certain furniture in the sum of $200. The foregoing provisions were incorporated in the divorce decree.

Glen Casad was then in the military service, which he had voluntarily joined before being drafted, and his wife and the children had been left by him in the home of the paternal grandparents. Obviously Eloise Casad, who was then in poor health, was without a home of her own into which to take her daughters, and with but $200 and the promise of but $75 per month for the support of the children was confronted with a condition then impossible of fulfillment. It is or should be understandable that she turned to Mr. Wilson for refuge and understanding, and joined him in Arizona. He was in the military service, and it is undenied that he took her to the home of his parents in Missouri who took her in and cared for her and where a son was born to her. And while she admitted that thereafter she and Wilson lived together as husband and wife, there is no evidence of misconduct other than the fact that their cohabitation was without the sanction of a marriage ceremony. There is no evidence that her conduct was in any sense promiscuous, or that the conduct of that couple was other than that of a legally married couple, or that there was more than a continuation of an intimacy begun some time prior to the agreement between Casad and his wife, and while Casad was absent from his family; and she testified that she told her husband of her love for Wilson and a desire for a divorce before the suit for divorce was filed. Under the law of this state prior to 1895 the conduct of the Wilsons, at least after the divorce became final, would have constituted a common law marriage, recognized as valid; and such marriages are still recognized by law in some states. (See Civ. Code § 55 as originally adopted. Also see *Sharon* v. *Sharon,* 75 Cal. 1 [16 P. 345] ; *White* v. *White,* 82 Cal. 427 [23 P. 276, 7 L.R.A. 799] ; *Estate of Richards,* 133 Cal. 524, 527 [65 P. 1034] ; 16 Cal.Jur. 914-917, § 11; 55 C.J.S., p. 816, et seq.)

Shortly after the death of Glen Casad in July, 1949, Wilson and Mrs. Casad were married under the auspices of the Catholic Church of which they are members. They had already established a modest home in Visalia, California, where Wilson was employed at a salary of $300 per month. On July 20, 1949, Raleigh Casad filed his petition for guardianship of the persons and estate of the two children, the estate consisting of $3,000, the proceeds of a life insurance policy left by Glen Casad. Mrs. Wilson then filed a similar petition seeking guardianship. On the hearing of the two petitions no showing whatever was made as to any present

unfitness of Mrs. Wilson to have the custody of her daughters. On the contrary there was testimony by three persons who knew her and Mr. Wilson in Visalia, one of whom was a next door neighbor, to the effect that they had known Mrs. Wilson for over a year, had visited her home frequently, had had opportunities to observe her fitness to keep a home and her third child; that she was an excellent housekeeper and a good and kind mother; and that she had overcome any mistakes she may have made in her past life.

It is well established that as between a parent and a grandparent the latter is a stranger to an action involving custody (*Roche* v. *Roche,* 25 Cal.2d 141, 144 [152 P.2d 999]; *Robertson* v. *Robertson,* 72 Cal.App.2d 129, 133 [164 P.2d 52]; *Becker* v. *Becker,* 94 Cal.App.2d 830, 833 [211 P.2d 598]), and as between him and the mother of these children her rights are paramount. (*In re White,* 54 Cal.App.2d 637 [129 P.2d 706]; *Roche* v. *Roche, supra*; *Stever* v. *Stever,* 6 Cal.2d 166, 170 [56 P.2d 1229]; *Newby* v. *Newby,* 55 Cal.App. 114 [202 P. 891]; *Robertson* v. *Robertson, supra,* at page 132.) Even as between husband and wife in actions for divorce, while neither is of right entitled to the custody of minor children, as provided by Civil Code, section 138, other things being equal, if a child is of tender years it should be given to the mother. This has often been held to be of special importance if the child is a girl. (*Washburn* v. *Washburn,* 49 Cal.App.2d 581, 587 [122 P.2d 96]; *Juri* v. *Juri,* 69 Cal.App.2d 773, 779 [160 P.2d 73]; *Estate of Lindner,* 13 Cal.App. 208, 212 [109 P. 101]; *Bemis* v. *Bemis,* 89 Cal.App.2d 80, 83 [200 P.2d 84]; *Noon* v. *Noon,* 84 Cal.App.2d 374, 379 [191 P.2d 35].)

It is undenied that nothing has been shown in this proceeding which reflects unfavorably upon the recent conduct of Mrs. Wilson, or is incompatible with a conclusion that if she once erred, she has rehabilitated herself. In *Prouty* v. *Prouty,* 16 Cal.2d 190, 194 [105 P.2d 295], the court said: "The question as to whether a parent is a fit or proper person to have the custody of a minor child refers, however, to his or her fitness *at the time of the hearing* and is not necessarily controlled by conduct many years prior thereto. (*Ott* v. *Ott,* 127 Cal.App. 322 [15 P.2d 896]; *In re Green,* 192 Cal. 714 [221 P. 903].) Evidence of prior acts of misconduct may be admissible if it can be said to have a direct bearing upon the issue of present unfitness, but such evidence should be limited to this issue alone." (Italics added.)

The rule that present fitness and not former misconduct should control in custody cases as stated in 67 Corpus Juris Secundum 662, is: "A parent who is, at the time when the question arises, a suitable and competent person to have the custody of the child will not be refused such custody because at some time in the past his conduct, habits, health, or circumstances were such that he would not then have been a proper custodian." Also it is said at page 661: "A parent may be denied the custody of a child because of bad moral character or reputation. The immorality, however, must be of so gross a character that the morals of the child would be seriously endangered, and proof of a lapse from moral standards or of one immoral act does not conclude the parent's right." Other California cases holding that fitness of a parent at the time of the hearing is the proper test to apply in cases such as this are *Guardianship of McCoy,* 46 Cal.App.2d 494 [116 P.2d 103]; *Guardianship of Jones,* 86 Cal.App.2d 35, 37 [194 P.2d 141]; *In re Green,* 192 Cal. 714, 721 [221 P. 903].

Cases from other jurisdictions follow the same rule. In *Cooke* v. *Cooke,* 67 Utah 371 [248 P. 83], the court said at page 102: "In this country the general rule is that a spouse, though found or adjudged guilty of adultery, will not, for such reason, necessarily be deprived of the care and custody of his or her children (*Haskell* v. *Haskell,* 152 Mass. 16 [24 N.E. 859]; *Ex parte Lincoln,* 128 La. 278 [54 So. 818]; *Brogna* v. *Brogna,* 67 Wash. 687 [122 P. 1]; *Richardson* v. *Richardson,* 36 Wash. 272 [78 P. 920]), and especially where it is shown *that the adulterous relation had ceased, or would not be repeated, or the morals of the child or children not affected thereby.* And such is the effect of our statute, under which, different from the laws of Canada, the mother, in case of separation of husband and wife, instead of the father, is given the paramount right to the care, custody, and control of minor children." (Italics by that court.) In *Vanover* v. *Johnson,* 201 Ky. 302 [256 S.W. 422], it was held that the mother of a girl child, who had been divorced and remarried, should not be denied custody as against its paternal grandparents, because she had committed adultery during the first marriage, where her conduct showed complete reformation. In *Woolston* v. *Woolston,* 135 Misc. 320 [239 N.Y.S. 185], it was held that the conduct of a mother in living with another as his wife after separating from the husband was not sufficient ground to deny her custody of children after the death

of their father. And in *Geismar* v. *Geismar,* 54 N.Y.S.2d 747, infidelities of a mother, which were said not to be notorious or in the presence of the children, were held insufficient to justify her deprivation of the custody of her children. Also see *Commonwealth ex rel. Martocello* v. *Martocello,* 148 Pa. Super. 562 [25 A.2d 855, 856]; *Commonwealth ex rel. Bock* v. *Bock,* 59 Pa.Super. 159 [48 A.2d 133]. In the latter case the trial court refused to make a finding that the mother was guilty of adultery, saying that it did not seem proper in the interests of the child whose custody was in controversy. But it said that a conviction of adultery would not, of itself, render her unfit to have custody of her child.

While the grandfather may be able to give to these infants greater material advantages, this court said in *In re White, supra,* at page 640, that: "The right of a parent to the care and custody of a child cannot be taken away merely because the court may believe that some third person can give the child better care and greater protection. One of the natural rights incident to parenthood, a right supported by law and sound public policy, is the right to the care and custody of a minor child, and this right can only be forfeited by a parent upon proof that the parent is unfit to have such care and custody." That language was quoted and approved in *Roche* v. *Roche, supra,* at page 144. Also, see, *Robertson* v. *Robertson, supra,* at page 133.

While in the proceeding before us the court did find that Mrs. Wilson is not a fit and proper person to have custody and control of her little daughters, that conclusion was based upon testimony of past events most of which dealt with events prior to the interlocutory divorce decree and the agreement of the parties in February, 1945, which were known to the husband and were, doubtless, made known to the court at that time. The evidence relied upon by petitioner Raleigh Casad shows that intimacies between the Wilsons began in 1944; and, as to the finding that when Mrs. Wilson had the children with her in 1944 she failed to care for them properly, this is based solely upon the testimony of Mr. Casad that when he called at her home one morning he found the children around in their night clothes, and their mother still in bed; and his further testimony that one of the children had eczema, which he attributed to lack of proper diet, though there was no medical testimony to support it. But be that as it may, it did not deter either Glen Casad in his agreement or the court in the divorce decree, from awarding the children to

Mrs. Casad, under the conditions hereinbefore stated. There being no evidence of *present unfitness* of Mrs. Wilson except such as may have been inferred from her conduct in living with Wilson while unmarried to him, the trial court must have based its finding of unfitness upon conduct some five years prior thereto. In my opinion such evidence should not have been admitted, particularly that of conduct prior to the interlocutory divorce decree. Nor do I consider that it is or can be for the best interests of these little girls that they be deprived of the love and companionship of their young mother and that the character of their mother forever be stamped as immoral. The puritanical notion that a young woman whose conduct does not conform with the mandates of the "double standard" of morals should forever after bear the scarlet letter is outmoded. And to paraphrase the language used in *People* v. *Mangum,* 31 Cal.App.2d 374, 382 [88 P.2d 207], it must be conceded that habits and social customs have altered since the origin of the rule mentioned, so that, in many respects, its application would be a grotesque anachronism. A more generous attitude toward the children as well as their mother would be to forget the past, and restore, as far as possible, the normal relationship between parent and children. It is unnatural that these little girls be raised by and dependent upon an aging grandfather, particularly since, with inexorability of time, he will become less and less capable of fulfilling the duties of mother and father to them; and in the event of his demise before these children reach their majority they will be left strangers to and alienated from their mother and dependent upon the support and care of strangers.

As for the assertions in the opinion of Judge Deirup that Mrs. Wilson "deserted" her children (he concedes that she did not abandon them) and that "she threw her children away once in pursuit of romance," in my opinion they are unjustified by the evidence in the case, as is the statement that "Perhaps she would like to get the insurance money; and that the little girls might be useful to her in taking care of her little boy." The evidence shows without contradiction that at the time Mrs. Wilson left California and went to Arizona, these children were, by the order of the divorce court, in the custody of their father, and that she was obviously unable to secure a home for herself into which to take them; that the attitude of the Casads toward her was unfriendly; and that shortly thereafter the legal custody of the little girls was given to their father by another decree of the divorce court. Under

these circumstances she cannot be said to have deserted them because she did not remain in California, and any assertion that she did not thereafter evince interest in them is contradicted by evidence that from time to time in 1945, 1946, 1947, 1948 and 1949 she sent them gifts and remembrances, some of which their custodians refused to accept and did not acknowledge. She was in no condition, either physically or financially, to do much in that respect, and under no legal obligation to contribute to their support. And when she returned to California in 1948, for the asserted purpose of seeing her children, she was met with objections from their father, and, after his death, from their grandfather. And regarding the aforesaid reference to Mrs. Wilson's desire to "get the insurance money," she stated that she would prefer that the court should appoint a bank or trust company to act as guardian of the children's estate and that she was interested in the children alone. But even if she were guardian of same, the children's money would not be hers to expend, but would be subject to the court's supervision. And, furthermore, she did not seek guardianship until after Raleigh Casad had filed his petition asking for appointment. And any assertion that perhaps Mrs. Wilson wanted her girls to take care of her little boy is purely fanciful and gratuitous.

Finally, as was said by the court in *Geismar* v. *Geismar*, *supra,* at pages 755-756: "Above all, the question here, as already observed, is not one of abstract morals, but rather whether the mother's indiscretions have been such as to affect her right to custody; whether the welfare of the children has been or will be harmed thereby. The law is not so vengeful as to punish the children through their mother.

"Since we are dealing with humans and not angels, we must take human frailties into account. Granted that the mother is not perfect, still, imperfection is not unfitness. And if we rejected anything short of flawlessness, our quest would have to go beyond and higher than this earth. . . .

". . . This is not a divorce action, calling for a branding with the scarlet letter. For the Court to assume a sanctimonious or puritanical attitude would not be realistic; it would not meet the practicalities here presented. A system of justice not seasoned with compassion and understanding would be unjust. A blind and merciless casting of the first stone is not the mission of the law."