[Civ. No. 14844.  First Dist., Div. One.  Nov. 30, 1951.]

Guardianship of Person and Estate of LYLANNE MORRIS, a Minor.  MARY E. SIMOTAS, Appellant, v. GEORGE JAMES MORRIS, Respondent.

Lawrence A. Cowen for Appellant.

Berwyn A. Rice for Respondent.

PETERS, P. J.—This is a contest over the guardianship of the person and estate of 7-year-old Lylanne Morris. The contest is between Mary E. Simotas, maternal grandmother of the child, and George James Morris, Lylanne's father. The child's mother is dead. Each of the contestants filed a petition. The father answered that of the grandmother, but she failed to answer that of the father. The two petitions were heard at the same time. The trial court, after a hearing, by minute order, denied the petition of the grandmother and granted that of the father. The grandmother appeals. Her basic contention is that the trial court abused its discretion in denying her petition and in granting that of the father.

The record shows the following: Lylanne is the daughter of George and Jeanette Morris. Jeanette was the daughter of appellant Mary Simotas. In March of 1949 George and Jeanette separated, and in September of that year Jeanette secured a Nevada divorce. Jeanette kept custody of Lylanne, and, after the divorce, Jeanette and the child lived with Mary Simotas in San Rafael. On December 13, 1949, George married again, and is presently married to his second wife.

On February 13, 1950, Jeanette committed suicide. About eight days later Mary Simotas, without informing George of the whereabouts of the child, placed her in a San Francisco convent. On May 25, 1950, George secured a writ of habeas corpus directing that the child be brought into court. Before that writ could be served, Mrs. Simotas removed the child from the convent and placed her in the home of a sister-in-law. Upon a hearing of the writ, the court ordered the child returned to the convent. Since that time the child has either been at the convent or at a camp at Monte Rio run by the convent. Both Mrs. Simotas and George stated to the court that it was their intention to leave the child in the convent regardless of who secured custody.

After placing the child in the convent Mrs. Simotas, who is divorced from her husband, the grandfather of the child, gave up her home in San Rafael, and moved to a hotel in San Francisco, where she is presently living.

Mrs. Simotas contends that the evidence demonstrates that George is neither morally nor mentally qualified to have custody of his daughter. George admitted that he has known Margaret, his second and present wife, since 1948. It was the theory of Mrs. Simotas that the marriage of Jeanette and George broke up because of the attentions paid by George to Margaret while he was still living with Jeanette. She so testified. George contradicted this evidence. He admitted that he met Margaret in 1948, because her father worked at the same restaurant as did George, but he testified that he did not "go out" with Margaret until about a month after he had separated from Jeanette. He admitted that he started to have sexual relations with Margaret in October of 1949, at which time Margaret was but 16 years of age. He married Margaret in December of 1949, and a child was born to them in June of 1950. He testified that at the time of the hearing (August of 1950) he was "living" with Margaret, but that she is actually residing with her father and he is sleeping elsewhere. He explained this by stating that his doctor had advised him that he needed a complete rest, and that, because the new baby cries quite a bit, it would be best for him to live alone for a few weeks. He testified, however, that he and Margaret are happy and contented together, and intend to reside together again. He sees Margaret every day and has dinner with her every night.

Two residents of San Rafael were called by Mrs. Simotas, and they testified that George's reputation for morality in San Rafael was bad. Neither knew George very well, and both were friendly to Mrs. Simotas. Both evidently based their conclusion as to George's morality on his relationship with his present wife before their marriage.

As to George's mental qualifications, he has attempted suicide on two occasions. The first attempt occurred on February 14, 1950, when he took an overdose of aspirin and elixir of codeine, a mild drug used as a cough medicine. This attempt occurred the day after Jeanette committed suicide. George was informed by his partner of the suicide on February 14th, and the partner also told George that Jeanette's father had ordered that George not go near the funeral parlor or try to see the child. George got in touch with his

attorney who advised him to telephone to Mrs. Simotas and request permission to attend the funeral. George telephoned to her to ask permission to attend the funeral. Mrs. Simotas was very disagreeable to him, and hung up the telephone. Later that day the coroner called upon George and requested him not to attend the funeral, but he did arrange for George to visit the funeral parlors when neither Mr. nor Mrs. Simotas was present. George visited the funeral parlors at 6 p. m. that evening. He testified that the sight of his former wife's body was a great shock to him. A couple of hours later, in a fit of despondency, he attempted suicide.

The second suicide attempt occurred August 12, 1950, at which time George took "sodium nembutal," a drug described as being of the phenobarbital family, and inhaled carbon monoxide fumes. This attempt was about eleven days before the hearing relating to the guardianship of the child. George stated that he had learned that Mrs. Simotas was going to produce the evidence about his premarital relationships with his present wife, that this upset him very much, and that he "dreaded coming into court."

George is a high school graduate. He attended a junior college for one year, and graduated from a night school after four years of study, with the degree of Bachelor of Commercial Science. He is a duly licensed accountant, at which business he worked until November of 1947. At that time he went to work for Mr. Simotas, who operated a restaurant in San Rafael. Early in 1949 George and another man purchased the restaurant, and thereafter operated it together until March of 1950, when George sold out to his partner. Between March and the date of the hearing (August of 1950) George had been unemployed, but he testified that he had been offered and accepted an accountant's job in Stockton. This job will pay $275 a month, plus a bonus, as a starting salary.

At the time of the hearing George had a little over $1,000 in cash, and was trustee for Lylanne of a cash fund of $175, and of some bonds totalling $1050. He testified that his mother, a widow, would help him financially if he needed it. George owes Mrs. Simotas $1,150 on some transaction, the nature of which was not disclosed. Since the return of the child to the convent George has been paying the convent $50 per month for her room, board and education, and taking care of her clothing and other needs.

A psychiatrist was called on behalf of George. He testi-

fied that he had examined George the day before the hearing; that George was "anxious," "tense," "intense," and "frustrated"; that George did not need hospital care, but could be helped by, and needed, out-patient psychiatric treatment; that he could not ascertain the basic cause of George's difficulties by one consultation; that it was his opinion that George could take care of himself and of his business affairs; that he did not need to be watched; that George was not a danger to other people; that if George were granted custody, his immediate anxiety would be markedly diminished; that superficially, at least, the anxiety of George grew out of worrying over what was going to happen to his daughter. On cross-examination the doctor testified that, in his opinion, George was competent to take care of his daughter.

Mrs. Simotas undoubtedly feels that her daughter's marriage was broken up because of the actions of George, while George undoubtedly feels that his mother-in-law interfered in that marriage. It is quite clear that there exists considerable bitterness between the two parties, and that Mrs. Simotas, while she has had custody of Lylanne, has tried to turn the child against her father. George testified that he had always been a kind and dutiful father to his daughter, and that he had never beaten her, although he had used "pats" to correct her when necessary.

Mrs. Simotas is divorced from her husband, the grandfather of Lylanne. Mr. Simotas testified that his former wife was a kind and thoughtful person, and that the divorce was his fault because he was "too much of a playboy." They had been married over 26 years at the time of the divorce. He admitted that he had had some "quarrels" with his wife, but denied that they had ever "fought." He denied that Mrs. Simotas ever drank to excess, but admitted that she occasionally took a drink or two. He testified that although his former wife occasionally played bingo or bet on a horse, it was not what he would call "gambling." It is quite obvious that Mr. Simotas heartily dislikes George.

On these facts the appellant urges that the trial court abused its discretion in denying her application and in granting that of the father. Although the evidence is conflicting and might support a finding either way on the issue of guardianship, we cannot hold, as a matter of law, that the evidence compels a holding that this child should be taken from her father and given to her grandmother.

"The appointment of a guardian for a minor is a mat-

ter lying within the sound discretion of the court and the conclusion reached will not be set aside on appeal unless it is shown to have been reached as a result of an abuse of discretion." (*Guardianship of McCoy*, 46 Cal.App.2d 494, 496 [116 P.2d 103].) ██ The burden of showing such an abuse of discretion, of course, is upon the appellant.

██ In determining the issue of guardianship, the primary fact to be determined by the trial court is what is for the best interests and welfare of the child. (*Guardianship of Reynolds*, 60 Cal.App.2d 669 [141 P.2d 498]; *Guardianship of Casad*, 106 Cal.App.2d 134 [234 P.2d 647].) This rule is codified in this state. Section 1406 of the Probate Code provides in part: "In appointing a general guardian of a minor, the court is to be guided by what appears to be for the best interest of the child in respect to its temporal and mental and moral welfare . . ."

██ Of course, as between a parent and others, all being equally entitled in other respects, a parent has and should have a prior right to be the guardian of his minor child. (Prob. Code, § 1407; see, generally, *Shea* v. *Shea*, 100 Cal. App.2d 60 [223 P.2d 32]; *Guardianship of Jones*, 86 Cal.App. 2d 35 [194 P.2d 141]; *Guardianship of Sloot*, 92 Cal.App.2d 296 [206 P.2d 862].) ██ This right is not absolute, but will yield to the primary consideration of what is for the best interests of the child. (*Guardianship of Casad*, 106 Cal.App. 2d 134 [234 P.2d 647].)

Appellant, while recognizing these principles, nevertheless claims that the evidence demonstrates an abuse of discretion in failing to award the child's custody to her. In this connection appellant argues that the evidence shows that George is some kind of narcotic addict. The evidence shows no such thing. While it shows that George uses codeine and phenobarbital, the psychiatrist testified that George needed some sedative. While drugs were used in both suicide attempts, the drug used in the first attempt was aspirin and elixir of codeine, which is a cough medicine, while "sodium nembutal" is a mild sedative of the phenobarbital family. There is no evidence at all that George was a drug addict.

Appellant also emphasizes that George twice attempted suicide, and urges that these attempts demonstrate that he is not mentally competent to have custody of his child. This, of course, was a very serious matter. George explained the circumstances surrounding each attempt, and, while those explanations are not entirely satisfactory, they do render

the occurrences understandable. Undoubtedly George is unstable. But the psychiatrist testified that George is competen to handle his own affairs and, in his opinion, was a proper person to take care of the child. Under the circumstances, it was for the trial court to weigh this conflict in the evidence and in the inferences therefrom.

Appellant emphasizes the testimony of the psychiatrist to the effect that granting custody to George would tend to relieve George's immediate anxiety, and contends that this demonstrates that the trial court awarded the child to George in order to benefit his mental condition, in derogation of the best interests of the child. Of course the trial court should consider the best interests of the child and not be guided by the bests interests of the parent. (*Matter of Lee,* 165 Cal. 279 [131 P. 749, 45 L.R.A.N.S. 91].) But here the evidence relied upon by appellant does not sustain her conclusion. The statement under discussion, when read in its context, demonstrates that the doctor was simply testifying that George's tendency towards self-destruction would be alleviated by awarding the child's custody to him. He also testified that George was a fit and proper person to have custody. There is no evidence that the doctor intended to imply that the trial court should disregard the best interests of the child, and there is no evidence that the trial court did so.

Some point is made of the fact that at the time of the hearing George was unemployed, and had been unemployed for five months. The evidence also showed that George was well trained and educated, and. had accepted a job as an accountant at $275 per month, plus a bonus, as a starting salary.

Much is made by appellant of George's premarital relations with his present wife. That too, was a factor, and an important factor, in determining whether the father was morally qualified to have custody of his child, and whether it would be to the best interests of the child to have her custody awarded to the father. But George testified that he had had no such relations prior to his separation from Jeanette, and there is no evidence that he was promiscuous. He did marry Margaret and the two are now happy in that relationship. Under the circumstances, the weight to be given to George's past derelictions was for the trial court.

■ Appellant makes some mention of three rulings of the trial court on the admission of evidence. We have examined these rulings and find nothing prejudicial in them.

All of the questions involved were directed to the psychiatrist on cross-examination by counsel for appellant. Although objections were first sustained as to all three questions, as to two of them the doctor was later permitted to answer. By the third question counsel tried to ask the doctor if he had a 7-year-old daughter, would he want her to be in the custody of respondent. The court properly pointed out that such a question involved different people and different personalities "and it won't help us in this case." The ruling was correct.

When all of the evidence is considered, we cannot hold, as a matter of law, that the best interests of this child require that her custody be awarded to her grandmother, and that the holding that such custody be awarded to the father is totally unsupported.

The order appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.