THE PEOPLE OF THE STATE OF NEW YORK ex rel. FRANÇOISE GEISMAR, Relator, against RAYMOND GEISMAR, Defendant.

Supreme Court, Special Term, New York County, March 23, 1945.

*Ben Herzberg* for relator.

*Osmond K. Fraenkel* for defendant.

COLLINS, J. This habeas corpus proceeding is a distressing contest between parents over the custody of their two children.

Each parent charges that the other is unfit to be entrusted with custody.

The children are Phillipe, a boy nine years old, and Anne, a girl of eight. The father is thirty-four, the mother, younger. The parents are separated, but not divorced. The children were with their mother in Canada when the father surreptitiously contrived their removal into the United States. Inasmuch as all parties are now within the jurisdiction of this court, the mother instituted this proceeding to wrest custody from the father.

The parties are French. The husband, though now an American citizen, is a French lawyer, and served on the staff of General De Gaulle. His mother was born in the United States, and his grandfather served in the Civil War. The wife studied law at the University of Paris, also art, sculpture and music. Her stepfather is a leading industrialist of France, concerned with electricity and petroleum. Her paternal grandfather was a historian, politician and French Deputy; her maternal great-grandfather was the leader of the Dreyfusards in the Dreyfus affair. Other members of her family are distinguished in the industrial, political and cultural life of France.

The children are intelligent and alert. Phillipe is inclined to be assertive and independent, but not unruly. He is not a robust boy. Anne is the more normal of the two. Both parents are refined and educated; both, alone or with aid from their parents, are able financially to maintain the children, though the wife's status in this regard is more favorable than that of the husband. She holds a paying position and has independent means. Both are devoted to the children, and the children to them.

Despite these incontestable factors, the intense nature of the case has engendered rancor, if not vindictiveness, and there has been the usual exchange of excoriations. Luckily for the litigants, however, and fortunate, too, for the court, the attorneys are of such probity and skill, and so profoundly imbued with the dignity and responsibility of their profession, that display of spleen was restrained to a minimum, and, thanks largely to them, the proceedings were conducted with the decorum and respect which the administration of justice demands.

The supreme issue here is the welfare of the children. (*People ex rel. Spreckles* v. *deRuyter,* 150 Misc. 323.\*) Such issue necessarily opens the inquiry " to the fitness of the parties to have

---

\* See, also, *People ex rel. Heller* v. *Heller,* 184 Misc. 709, and *" Horner "* v. *" Horner ",* 184 Misc. 989, affd. *sub nom.* Hartstein v. *Hartstein,* 269 App. Div. 770.— [Rep.

the custody of the " children " and the inquiry extends * * * to the habits and character of the parties." (1 Bailey on Habeas Corpus, p. 582.) The wife's attorneys rightly declare that " the character of each is important because of the influence on the children."

Thus, the unpleasant, and quite often, cruel exposure and exaggeration of the frailties of the parties become unavoidable; mutual detraction and condemnation is inescapable; self-praise and overpraise, natural. This casts upon the court the disagreeable onus of commenting on unsavory facts.

The mother insists that she meets the test of fitness — that " she is a woman of education, refinement, strong maternal feeling, deeply interested in the welfare of her children, competent in every way to take care of and provide for them and to surround them with such influences as will tend to promote their physical health and their moral and mental welfare." (*People ex rel. Sternberger* v. *Sternberger,* 12 App. Div. 398, 404–405.) To be sure, this litigation stems from the husband's challenge to the accuracy of his wife's self-evaluation. He maintains that she is morally unfit to rear the children, that she has a bad influence on them. In corroboration, he points to her confessed infidelities with at least two men. Indeed, her improprieties constitute the basis of an action for divorce which he has projected against her. Moreover, contends the husband, she neglected the welfare of the children, left them alone nights, and manifested other indifferences to their proper care. He says he took the children from Canada because of the wife's secret plans to remove them to France. Finally, he asserts that the children prefer him.

The wife maintains that the father has seen very little of the children during the past few years; she protests that his desire to wrest the children from her custody is not genuine, but rather a process to punish her; that he is unable, financially or otherwise, to take care of them. She says that he is a neurotic, and that this has an unwholesome influence on the children. She denies that the children prefer their father to her, and denies, furthermore, that she planned to take the children to France until after the war. She scorns the husband's war record as cringing and as exhibiting a weakness of moral as well as physical courage. Concerning the infidelities, she stresses the acknowledged fact that she has been separated from her husband for several years, that he knew all about the acts, and condoned them; that they had planned a divorce, after which she was to marry one of the two men. In all events,

she argues, her indiscretions were not notorious, did not occur in the presence of the children, and that the children were in no way harmed or affected thereby. At all times, she protests, she conducted herself with the utmost propriety before the children, and she buttressed this protestation with formidable proof that she enjoyed a good reputation in the community where she and the children lived.

To resolve these respective contentions, a more elaborate discussion and analysis of the facts might be helpful.

The parties were married in Paris, France, on April 20, 1933, and lived in France until the fateful fall of that country, on June 14, 1940. The husband then made arrangements for his wife and children to go to Montreal, Canada, where they arrived on September 1, 1940. There they made their home, until the occurrence which precipitated this proceeding. The husband, however, did not make his home with them.

Not only did these parties escape from France, but about the same time, the husband's parents, and his sister and aunt, all former residents of France, took refuge in New York City.

In 1942, when the husband was temporarily stationed at St. Pierre and Miquelon, French possessions in the Gulf of the St. Lawrence, he secured immigration quota visas for the children, and thereafter, to keep the visas from lapsing, the children made short visits to the United States. They attended schools in Montreal.

Over the last Christmas holidays the children were at Sun Valley Farm, Val Morin, Quebec, near Montreal, with their nurse. The mother had qualified herself to do office work, and was attached to the French Naval Mission in Montreal.

The husband spent several days with his children at the Farm, and on Christmas Day, returning to Montreal, he opened the combination safe in his wife's apartment during her absence, and, without her knowledge or consent, removed the children's passports and their border crossing permits, which permitted them to enter the United States. Then he returned to the farm, told the nurse that he desired to be with the children for two days, and, without advising the wife, took the children to New York City. On December 28, 1944, the wife communicated with her husband and demanded the return of the children, but he refused the demand. She declares that on that day she discovered for the first time that he had rifled her safe. The reason he gave her for taking the children was that he had been informed that she had been maneuvering to return to France.

Thereupon, the wife came to New York and engaged counsel to regain custody. The children were kept a while in a Newark hotel, where a woman friend of the husband deceptively registered from Memphis, Tennessee, the names of the children not appearing.

There was difficulty in serving the husband with the writ of habeas corpus. He spurned the process and denied his identity. Finally, of course, the writ was served and all parties appeared in court.

The hearings were protracted, and every aspect of the case was delved into thoroughly. Because of the delicacy of the issue, wide latitude was accorded in order to garner as much light as possible to aid toward a proper determination.

(1) Much of the seven hundred pages of testimony and many exhibits pertain to the father's war record. The husband proudly and stoutly maintains that that record is honorable and creditable, if not heroic. The wife, as has been noted, denounces the record as indicating a craven character. Because thereof, she announces she " is ashamed of him ".

Without going into great detail concerning the husband's service in the armed forces, the official records indicate that he evaded actual combat, that whenever he was confronted with combat, he contrived to escape it.

He asserts that he served as an artillery officer (lieutenant, later captain) in the French Army, and in 1939 and 1940 took part in the fighting in Lorraine, France. This claim, however, is seriously assailed. The wife says he was ordered to the front, but that he maneuvered to be safely elsewhere. That he actually fought is, to say the least, doubtful.

According to the official records of the French Military Mission in the United States, with offices in Washington, the husband's military record with the Free French forces is as follows: " Mr. Geismar, in July 1940, went to London to join the Free French Forces under the command of General De Gaulle. Then, he went to St. Pierre and Miquelon where he served as Chief of the Military Cabinet to the Administrator of St. Pierre and Miquelon in June 1942. He then went to the United States where he was sent for training to Fort Pierce, Florida, from February 15, 1943 to April 25, 1943, and again from September 10, 1943, to October 8, 1943. From there, he was assigned to the French ' Bataillon des Antilles ' (Antilles Battalion) at Fort Dix, New Jersey, having completed his course at Fort Pierce. In December 1943, he was ordered overseas, but on the eve of his departure, he went to his sister's

home in New York, summoned a civilian doctor, and reported he was unable to depart. But, a week later, the Army Medical doctor found him fit for overseas duty. In March 1944, he was again ordered overseas, but managed to be attached to the French Supply Council in Washington, D. C., and was demobilized on March 29, 1944. By order of General DeGaulle dated April 29, 1944, Mr. Geismar was instructed to be remobilized and sent overseas. The order was issued by the Chief of the French Military Mission in the United States on May 8, 1944. He refused to receive the orders which were brought him by an official of the French Military Mission. Consequently, he was demoted to Private, and is being prosecuted by the Court Martial in Fort de France, Martinique ''.

The evidence shows that when refusing to receive his remobilization orders, the husband escaped through the rear exit of his Washington residence. He immediately wrote to the then Acting Secretary of the Navy Forrestal, offering to serve in the Navy. A few days previously he had registered with a Selective Service Board in New York. He was accepted for service and became a seaman, second class, but in February, 1945, he was '' given an honorable discharge for medical reasons ''. It was attested by the Navy that '' His service record is good and his motivation to remain in the service was excellent ''. After three months of service in the Navy he became an American citizen. He is not now in the service.

Thus, it would seem that at no time did he participate in actual fighting. Whereas the stricture of the wife's counsel that the father '' was disloyal to his own country, avoided service overseas, and then enlisted in the American Navy for the purpose of obtaining American citizenship and so avoid French court-martial '' is rather severe, certainly the record of this father for valor is far from impeccable. Again and again and again, when faced with orders for combat service, he pleaded illness, sometimes — so the medical authorities found — the basis for the illness was not substantial. The wife charges that the illnesses were feigned.

Now, while the father's war record is illuminating as casting light on his character, it is by no means so significant as to be decisive of his fitness for fatherhood. The lack of physical courage alone would no more denote the father's unfitness to have custody of the children, than would the possession of extraordinary physical courage qualify him for the role. To be '' so dauntless in war '' is, of course, an estimable virtue, but a father is not to be deprived of his children just because

he is "a dastard in war". No, the yardstick to be applied here is not intrepidity. Nor is this a court-martial.

(2) Then, too, there is testimony bearing on the husband's change of name, the insinuation being that he sought thereby to conceal his identity or disassociate himself from his record and previous activities. Such testimony, however, is much too tenuous to constitute a predicate for any finding with respect thereto.

(3) The mother's disavowal of a secret intention to spirit away the children to France is none too convincing. She declares that with the invasion of Normandy, she thought the war would terminate soon and that, consequently, she made inquiries as to the possibilities of returning to her homeland when hostilities ceased. To be sure, more knowledgeable persons than the wife opined that the war would end long ago. The documentary evidence, however, apparently supports the husband's charge that his wife planned to depart for France regardless of the war's duration. As an influential French industrialist, with entrée to high places, her stepfather seemingly was aiding her in her plans.

The wife counters that the husband had access to the Canadian courts and that all he had to do was to procure a forestalling order, that it was wholly unnecessary to resort to such extreme clandestine methods as he employed. Whatever intentions the wife had those plans have been halted; she now resides here in New York City, has a paying position here, and pledges to remain here. Her good faith impresses me favorably.

(4) As indicative of the mother's indifference to the children, the father points to the circumstance that in a will as well as in a codicil, he named some of his relatives, either alone, or jointly with the mother, as the children's guardians, and that the wife fully assented thereto. She retorts that she sought legal advice, and after being told that such provisions were nullities, she consented. As to one of the documents, she swears she was "forced" by her husband to sign it. Whatever is the truth about this, even if she committed "an egregious blunder", her conduct is not irretrievable. Children are not chattels to be traded in or disposed of at the whim and caprice of parents. "In any event, the mother's conduct is not the prime consideration here. What she did is important only as bearing upon her fitness to be the custodian of her children". (*People ex rel. Spreckles* v. *deRuyter*, 150 Misc. 323, 325, *supra*.) Although I cannot go so far as to find that at no time has this mother acted foolishly regarding the children, I am

satisfied that at no time did she intend to abdicate her legal or moral rights as mother in favor of anyone else.

(5) The father has no home of his own. Were custody awarded to him, the children would have to live with the father's relations. His people are genuinely devoted to the children, and the children to them. Nevertheless, this would not be the happiest of desideratums. As is natural, they are on the father's side, and this does not make for harmony. Moreover, the father has no means of his own, and although his relatives are in comfortable circumstances and have been, and undoubtedly would continue to be, generous to the children, it would not be the wisest course to have the children dependent on the bounty of their father's relatives. The mother, on the other hand, lives alone in small but comfortable and adequate quarters. She works half a day (while the children are in school) in the legal department of the French Supply Council, and is quite capable of earning money. Her people, too, are financially independent. In addition, she has funds and securities of her own, ample for her and the children's needs.

(6) Though the father attacks the mother's treatment of the children, I am persuaded that she is deeply devoted to them and that she has their best interests at heart. Even the father concedes that up to a short time ago, the mother was an excellent influence on Phillipe, but asserts that she never treated Anne equally well. I find no justification whatsoever for the attack. Phillipe has always been sickly and high-strung, whereas Anne has been more normal. Perhaps, therefore, it seemed that the mother discriminated in Phillipe's favor. Phillipe's frailty has required a certain amount of coddling, but at no time has Anne been neglected in any sense or degree. The evidence shows that the mother loves them equally, impartially. Doubtless, at times, both children have been reprimanded, even chastised, and this has been magnified beyond all proportion. I am convinced that the mother merely exercised the usual and common prerogatives of parenthood. Such incidents are inherent in the relation of mother and child. She did nothing more, I am fairly sure, than administer reasonable discipline. A number of witnesses from Canada and here, people of standing and repute, who visited the mother and the children, and who had occasion to observe their attitudes, have testified to her unstinting devotion to the children, and to the normal, healthy relation of mother and children. It may well be that the mother's Gallic temperament is quite articulate, but **an acrimonious contest over the custody of her children is far**

from a soothing experience. What is more, the husband is not the quintessence of tranquility; he suffers from psychosisneurosis. He, too, has had plenty of provocation to nervousness. Since the war, both have been subjected to such extraordinary stress and strain and anguish as to unnerve the coolest and hardiest. In addition to all else, the wife's brother was killed in 1942 fighting with the Free French Forces; the same year, a sister, connected with the " Resistance Movement ", was imprisoned by the Italians. The nerves of both parties have been lacerated.

(7) At one stage of the proceedings Phillipe expressed a preference for his father. The circumstances, however, compel the thought that the choice was inspired. I am sure that, let alone, allowing nature to take its course, without abetment, he would be happy and satisfied with his mother. Of course, inasmuch as the welfare of the children is the paramount consideration, it would be harsh and cruel to award Phillipe's custody to his mother against his pronounced preference. But he was content to be with her before this litigation, and, as stated, I am persuaded that he will be happy with his mother. To allow this nine-year-old boy's isolated expression of preference to prevail, would be tantamount to substituting his tutored choice for the judgment of the court. Even the choice of a sixteen-year-old boy was disregarded in *People ex rel. Glendening* v. *Glendening* (259 App. Div. 384, 392) where the court — the mother having lived in notorious adultery and frequently violated the orders of the court — appositely observed: " To rule otherwise is to disregard the established facts, practically to abandon the jurisdiction of the court and make a boy of sixteen the sole judge of his own moral, intellectual, physical and spiritual welfare ".

It bears repeating, that if I thought the isolated expression of preference was deep and genuine and uninfluenced, I would accord it greater weight.

Then, too, to award Phillipe's custody to the father and Anne's to the mother, would not make for happiness for either child. There is about a year's difference in their ages, they are companionable and compatible, each is good for the other. If the mother is fit to have the rearing of her daughter, she is not unfit to have the custody of her son.

The fact that Phillipe is nervous and none too robust — he suffers from asthmatic bronchitis — makes it all the more necessary that he have the care and tenderness of a mother. I think that the mother understands him, and sympathizes with his

nature, temperament and physical condition. " With exceedingly rare exceptions there is no substitute for maternal attachment; no replacement for the fealty lavished by a mother ". (*People ex rel. Spreckles* v. *deRuyter,* 150 Misc. 323, 324, *supra*).

(8) Each party presented the testimony of a woman doctor specializing in the nervous and mental diseases of children who, after visits to the children, testified for her respective side. Since both are physicians of character, ability and reputation, and since their testimony was contradictory, one canceling the other, their evidence, albeit interesting and instructive, is not a guide to the solution of our problem.

(9) Inasmuch as the mother forthrightly admits derelictions with two men, it becomes necessary to consider whether such conduct, *ipso facto,* precludes awarding her the custody of the children. This depends, of course, upon the effect her conduct has had or might have on the children. There is no evidence that the indiscretions were notorious or that they occurred in the presence of the children. Adultery alone is not a bar. (*Matter of Lefkon* v. *Lefkon,* 267 App. Div. 836; *Rizzo* v. *Rizzo,* 246 App. Div. 838; *People ex rel. Terman* v. *Terman,* 267 App. Div. 173.)

Though the father charges that the indiscretions were more general and not confined to the admitted two, promiscuity is not established. Of the two, the mother avows that she was to marry one, but that marriage was obstructed by the refusal of the man's wife to divorce him. The evidence shows that the husband knew all about the affair. The wife declares that the husband approved of her contemplated marriage; that, indeed, the husband and the other man went so far as to discuss arrangements for the divorce. She says that as far back as 1938 in France they — husband and wife — spoke of divorce, and that when she asked him on arrival in Canada, " must I consider myself as your wife or not? " he replied, " Of course, after all that we have gone through you are free, if you have a chance to re-make your life, to do so, and then I will give you your liberty back ". The husband admits writing to his parents-in-law and aunt-in-law telling them about his wife's " decision " and that he certainly was " not going to break a chance for her to be happy ".

It bears emphasis that the father's reason for taking the children from their mother is not her infidelities, but rather " in order to prevent " her from " taking them to France ". More than that, after spiriting the children off, he told her, at least twice, that if she would come to New York to live he would

arrange for the children to be with her. Evidently, therefore, he did not then think that her derelictions unfitted her for custody. His sole aim was to frustrate their return to France.

Again, at the time of the derelictions, husband and wife had been separated for several years. Still again, it is not so certain that the husband himself has been free from indiscretions.

Then, too, this husband and wife concededly had sexual relations together in Montreal, and again in New York as late as May, 1944. She says he sought to have such relations with her around Christmas time, in 1944, but this he denies.

Above all, the question here, as already observed, is not one of abstract morals, but rather whether the mother's indiscretions have been such as to affect her right to custody; whether the welfare of the children has been or will be harmed thereby. The law is not so vengeful as to punish the children through their mother.

Since we are dealing with humans and not angels, we must take human frailties into account. Granted that the mother is not perfect, still, imperfection is not unfitness. And if we rejected anything short of flawlessness, our quest would have to go beyond and higher than this earth. Then, too, while we are applying the law of New York, in judging the conduct of these parties we cannot overlook their Continental background.

My finding on this phase of the case is that the wife's conduct does not effect a forfeiture of her claim to the children's custody.

Let it be distinctly understood, however, that this finding is in no sense to be interpreted as an approval or condonation of the mother's behavior. Such, indeed, is not the precise question before the court. This is not a divorce action, calling for a branding with the scarlet letter. For the court to assume a sanctimonious or puritanical attitude would not be realistic; it would not meet the practicalities here presented. A system of justice not seasoned with compassion and understanding, would be unjust. A blind and merciless casting of the first stone is not the mission of the law.

(10) My conclusion on the entire case is that custody of both children should be awarded to the mother, with appropriate visitation privileges to the father. This conclusion is no reflection on the father. I am persuaded that the interests of the children will be better served by this disposition.

It is fervently hoped that the parties will agree on the visitation provisions. They are entreated to subordinate their animosities and to act solely for the good of the children.

The court is mindful that no disposition of this heart-tugging case will be or could be entirely satisfactory to all parties concerned. Not possessing omnipotent or clairvoyant powers, the court can do only what it deems the facts dictate should be done. Fortunately, the present disposition is not irrevocable or unchangeable. There is no such finality as bars modification should the welfare of the children demand such a course. The portals of equity are always open to the wards of chancery. But neither party is to quibble or exercise intolerable surveillance over the other, simply to fabricate or fashion a predicate for modification. Nor is this an invitation to the parties to run to the court on the slightest provocation. The court serves as chancellor, not as policeman or governess.

The mother must refrain from doing anything to violate the confidence the court is reposing in her. Correspondingly, the father must refrain from doing anything to violate the letter or spirit of the visitation privileges. For either parent to say or do anything which might tend to poison or prejudice the children against the other parent, would not only work to the offending parent's disadvantage, but it would be harmful to the children. Anything calculated to instill hostility is to be shunned. Everything possible to harmonize the relation between parent and child must be done. In a child of discernment and sensitivity, maligning a parent is calculated to produce resentment — instead of poisoning the child against the parent maligned, the reaction might be to poison the child against the malignor. The parties need not be reminded that this admonition is not wholly academic; already there have been happenings which can only hurt all concerned. Such scenes as occurred at the husband's sister's home during one of the recesses should be avoided. Friction should be eschewed. The parties must *earn* and *deserve* the love and respect of their children and the confidence of the court.

The writ is sustained. If the parties cannot agree on the provisions of the order, they may present written suggestions thereon. Settle order.

(On reargument, April 7, 1945.)

Communications from counsel will be treated as an informal application by the respondent for reargument. As such application it is granted.

Quite obviously the respondent has misread or misapprehended some parts of the decision awarding custody of the children to the mother, with visitation rights to the father.

(1) However, the respondent's grievance that there is no testimony to the effect that he suffers from psychoticneurosis is wholly justified. The testimony is that respondent suffers from psychosisneurosis and not from psychoticneurosis. The grievance, however, is against the Law Journal, which made the typographical error, instead of the court (N. Y. L. J., March 26, 1945, p. 1141, col. 1). The text published in the Law Journal, compared with the original text signed by the court (*supra,* p. 906) shows that the original uses the term psychosisneurosis, as established in relator's Exhibit 16. To correct the error which was inadvertently committed, it is hereby stated that the documentary evidence shows that the respondent suffered from psychosisneurosis, not psychoticneurosis.

(2) Respondent takes umbrage at that part of the opinion which refers to his military record with the Free French Forces. The affidavit in which that record is chronicled is in evidence, over respondent's objection. Apart from that affidavit, however, virtually all the facts therein recited are in evidence from other sources. As stated in the original opinion, although the respondent's " war record is illuminating as casting light on his character " (*supra,* p. 903), it bears repetition and emphasis that the respondent's military record was not decisive of the result. It was a factor, an item of proof, considered along with all the other facts and circumstances in the case, as shedding light on the character and consequent influences of the respondent. Even had there been no evidence at all concerning the respondent's military record, or even if the respondent had covered himself with martial glory and wore decorations galore, that, in and of itself, would not entitle him to the custody of the children against the rights of the mother. Considering the other factors in the case, the determination reached would have been the same.

The court distinctly declared that awarding custody of the children to the mother " is no reflection on the father " (*supra,* p. 908). No single factor, standing alone, was decisive of the issue; all the evidence, integrated, was weighed and considered. Nor did the opinion essay an analysis of or reference to all the evidence in the case. Nevertheless, the whole record was considered and pondered. On that record the father " failed to establish that his right to custody is paramount to that of the mother " (*Application of MacAlpine,* 50 N. Y. S. 2d 232, affd. *sub nom. People ex rel. MacAlpine* v. *MacAlpine,* 267 App. Div. 952). The interests of the children were accorded paramount consideration.

Certainly there was no intention to characterize or judge the respondent's military record beyond or apart from the record in the case. The court is not responsible for what the record indicates. Indeed, the record in this regard is not entirely negative. Some of the military authorities spoke well of the respondent. Respondent's Exhibit I, a confidential communication from the commanding Captain of the United States Navy at Fort Pierce, Florida, praises the respondent as having " shown keen aptitude and great ability. It is the opinion of the commanding officer that he (respondent) is a splendid officer in every respect."

(3) The relator's suggestion that the father's right of visitation be conditioned on his contribution to the support of his children is rejected, without prejudice, however, to an application therefor to the proper tribunal and in an appropriate proceeding. (*Application of MacAlpine, supra.*) Whether the respondent *should* contribute toward the maintenance of the children while in the custody of the mother need not be passed upon here. The evidence shows that he is paid $75 a week by his father's company, and that over a period of four years he and his family had paid the wife for her and the children's support over $8,000, and, furthermore, for years his family contributed $50 a month to the governess for the children. More than that, they enrolled Phillipe in a private school. Whether the children should be treated less generously because custody is being awarded to the mother is not the present concern of the court. It is assumed that the father and his family will not allow the children to suffer.

It is deemed unnecessary to comment on the other phases of the respondent's informal application for reargument. The original decision is adhered to. No costs.

Inasmuch as neither order submitted by the parties conforms in all respects to the court's conclusions, the court has revamped and coalesced the provisions of the two orders. The revamped, coalesced order is signed herewith.