Frank E. Thomas, J.
Gunda Macan, the natural mother of Martin Emery Jeffrey, petitioned the Children’s Court of Broome County for an abrogation of the adoption of Martin Emery Jeffrey granted by the Children’s Court on the 22nd day of October, 1957.
The petition for the adoption at that time was accompanied with the consent of Gunda Macan, the natural mother of said child, to the adoption of said Martin Emery Jeffrey by Lucille Jeffrey, wife of Walter Jeffrey, the natural father of Martin Emery J effrey.
The circumstances leading up to this adoption are briefly as follows: Walter Jeffrey and Gunda Scott, now known as Gunda Macan, married on April 21, 1946 and to them were born two sons, John, on June 14,1947 and Martin Emery, on February 21, 1951. This marriage was a difficult and stormy one, which was terminated finally by a divorce procured ¡by Gunda Jeffrey, now Macan, against Walter Jeffrey in the month of November, 1951. In said decree of divorce said Gunda Jeffrey was granted custody of said children, John and Martin Emery Jeffrey. A petition to enforce payments for the support of said children under the divorce decree was filed in the Broome County Children’s Court shortly thereafter, and a further proceeding was filed by the Commissioner of Public Welfare of the City of Binghamton alleging neglect of said children, John and Martin Emery Jeffrey, on September 25,1952. As a result of the hearing on said neglect petition, custody of said children was vested in the Commissioner of Welfare of the City of Binghamton, with the right to place said children in the home of their natural father, Walter Jeffrey, he having married Lucille Jeffrey, the present foster mother of said Martin Emery Jeffrey, on April 12, 1952. Lucille Jeffrey was the corespondent named in the divorce action above mentioned, brought by Gunda Jeffrey against Walter Jeffrey, but the placement in the natural father’s home was made pursuant to an investigation of the case worker of the Commissioner of Public Welfare of the City of Binghamton and was to be under their continued supervision.
Gunda Jeffrey, the natural mother of said children, married Michael Macan on August 22,1953 and after said marriage, said mother, Gunda Macan, was permitted to have periodic visitations of said children, John and Martin Emery Jeffrey. Said visitations were under the continued supervision of the Commissioner of Public Welfare of the City of Binghamton and said agency’s worker. These visitations were fraught with bitterness and quarrelling on the part of both Walter and Lucille Jeffrey and Michael and Gunda Macan, and the son, John, finally went to live *233 with his mother, Ghmda Macan. The situation continued with Martin Emery living with the natural father and his then wife, Lucille Jeffrey, and John living with the natural mother and her then husband, Michael Macan, until in or about the year of 1957 when the attorneys for the respective parties and the parties personally, and with the approval of the agency worker for the Commissioner of Public Welfare’s office, undertook to settle the matter finally and once and for all, by Michael and Cunda Macan adopting J ohn and Walter and Lucille Jeffrey adopting Martin Emery. Walter Jeffrey signed a written consent for the adoption of John by Michael Macan and Ghmda Macan signed a written consent for the adoption of Martin Emery by Lucille Jeffrey. Said petitions and consents and agreements were presented to the court with a written investigation report of the agency worker recommending the respective homes for the respective children, and the court granted and approved said adoptions on September 16, 1957. At the same time the court entered an order on the neglect petition relieving the Commissioner of Public Welfare of any further custody and control of said children. After said period no further visitations were had by either of the parties to the child of the other parties.
In the year of 1961 the marriage of Walter Jeffrey and Lucille Jeffrey, which had been fraught with trouble and turmoil, ended in a separation agreement wherein and whereby said Walter Jeffrey in the month of June, 1961 gave to Lucille Jeffrey the sole custody of Martin Emery and agreed to pay certain sums of money for the support and maintenance of said Martin Emery. It was during this period in the latter part of 1959 and the early part of 1961 when Walter Jeffrey and Lucille Jeffrey were having so much difficulty in their home, quarrelling and fighting, that on one or more occasions Lucille Jeffrey lost her temper and injured Martin Emery to the point that it was necessary for him to go to the hospital and have certain stitches made in injuries created as a result of these altercations. It was apparent during this period of time that Martin Emery, faced with the continual fighting, bickering and quarrelling between Walter Jeffrey and Lucille Jeffrey, and the other instances referred to, was failing in school and in other ways being neglected. Martin Emery was attending a school which was also attended by his brother, John, and turned to his brother for sympathy under the situation and circumstances. When the situation surrounding the home life of Martin Emery came to the attention of his mother, Ghmda Macan, through his brother, John, she prepared to take steps to make the application to set aside the adoption of Martin Emery. Walter Jeffrey, having finally *234 signed the separation agreement whereby he gave custody of Martin Emery to Lucille Jeffrey, now was interested in procuring the abrogation of the adoption so that the natural mother of said child would have custody of him.
The petition alleges cruelty, misusage, inability or refusal to support, maintain and educate said child, and other violation of duties on the part of the foster mother of said child. The hearings began on December 20, 1961 and continued until April 16,1962. The court has taken a great volume of evidence; many exhibits have been admitted in evidence; briefs have been filed in the matter in exchange between counsel for respective parties; and the matter now comes on before the court for decision. (Thomas, J.)
The court had jurisdiction of the adoption and of the abrogation proceeding. Section 109 of the Domestic Relations Law cites ‘ ‘ Judge ” to mean among other Judges, a Judge established under the Children’s Court Act of the State of New York. The jurisdiction of the Children’s Court Act of the State of New York (§ 6, subd. 1, closing par.) gives the court jurisdiction as conferred on County and Surrogates’ Courts as concerns adoptions of children under the jurisdiction of the court. The children were under the jurisdiction of the court in the support proceeding and the neglect petition previously referred to. Application to abrogate an adoption must be brought before the Judge of the court in which the original adoption took place. (Domestic Relations Law, § 118-b.)
An application may be made to the Judge of the court in which the original adoption took place for the abrogation of such adoption, on the grounds of (a) cruelty, (b) misusage, (c) inability or refusal to support, maintain or educate such child, (d) * * * or (e) any other violation of duty on the part of the foster parents or parent towards such child. (Domestic Relations Law, § 118-a.) The section goes on to state that the Judge shall determine if any of the grounds for such application exist and that the interests of such foster child shall be promoted by granting the application and that such foster parent has justly forfeited his right to the custody of such child and that an order abrogating the adoption shall be made.
The evidence will disclose that the past records of the natural mother, G-unda Macan, and the foster mother, Lucille Jeffrey, were not good. There is little merit in a comparative evaluation of the past records of these two women. The court should interest itself in the past only as it may relate to the present or possible reversion in the future. The indiscretions, lack of morals, irresponsibility and acts of neglect should not forever *235 deprive a person of the custody of a child if the person has shown over a safe period of time that he or she has made a good, wholesome adjustment.
The marriage of Gunda Macan to Michael Macan stabilized her life, and they have to all apparent purposes, been successful in their marriage; have been happy with their adopted son, John; and now have a child of their own. It is apparent from the court-appointed investigator on this application that in this home there is warmth, affection and adequate means to meet the needs of said Martin Emery Jeffrey.
Lucille Jeffrey had an unfortunate first marriage and her second marriage to Walter Jeffrey was one fraught with difficulties, upsets, quarrelling and fighting. She was compelled to work outside the home to meet the economic needs of the family. During the years of 1959,1960 and 1961 she was in the hospital several times. Her state of health was not good during this period when she was having so much difficulty with her husband, Walter Jeffrey, but since the separation of Walter Jeffrey from Lucille Jeffrey, the home has stabilized itself. Lucille Jeffrey now has an excellent position and is highly thought of by her employer, Martin Emery Jeffrey is relaxed and happy and is doing exceptionally well in school, and seems to be a well-adjusted young person in every respect. He is deeply loyal to his foster mother, Lucille Jeffrey.
There is little good that can be said of Walter Jeffrey. He appears to have brought nothing but trouble, grief and turmoil to both wives of his marriages. There seems to have been constant quarrelling in both homes, lack of income, failure on his part to work and support the family or to remain for any period of time in one location. Marriage with him in both instances is indicated to have been fraught with turmoil, uncertainty and instability. One wonders of his interest in the abrogation. When the Macans adopted John, Walter Jeffrey was freed from the responsibility of any further payments for John’s support, maintenance and care. Could his apparent interest and activity in the pending application have underlying it the thought that the Macans would assume the responsibility for the support and maintenance of Martin Emery so that he might be freed from any further court order for his support and maintenance ?
That there is a concern and a deep affection for this child in the hearts of both the natural mother and the foster mother the court does not question. What mother, no matter what has happened in her life, or what she has done or failed to do, can ever forget a child that has been born to her? It may well be said for Lucille Jeffrey that she too, has a deep regard and *236 affection for this child by reason of the fact that the child came to her before he was two years of age under conditions that indicated he was suffering from malnutrition and a heart condition and that he was not at all strong or well. She continued to care for this child and to meet his needs daily all during the period of her married life with Walter Jeffrey, and had continuous care of this child except for periodic, brief visitations with the natural mother, which were under such trying conditions that it was difficult for the child and gave him no real opportunity to become attached to or really know his natural mother. Lucille Jeffrey has continuously given of her time, effort and affection in the care and rearing of this child for upwards of nine years.
Counsel for the petitioner raises the question in reference to the completion of the adoption by Lucille Jeffrey, in that the final order and papers in connection therewith were never filed in the County Clerk’s office. The respondent, Lucille Jeffrey, testified that the reason the papers were not filed in completing the adoption, was because she had been unable to pay the attorney engaged to complete said adoption. When Lucille Jeffrey and Walter Jeffrey separated, he had never paid the attorney in connection with the adoption matters, and he had also left her with the payment of certain debts of his making, which she was bound to pay by reason of indorsement, which made her liable on the claims. The court deems that for all purposes the adoption was completed upon the signing of the order of adoption by the court.
The petition for abrogation must stand or fall upon the question of adequate proof of certain existing conditions as more fully set forth under section 118-a of the Domestic Relations Law of the State of New York, which grounds were fully alleged in the petition. The proof indicates that during the latter period of the marriage of Lucille Jeffrey and Walter Jeffrey, due to the continual instability of the marriage, the constant arguing and the failure of Walter Jeffrey to provide adequate support and maintenance for the family, there were many stresses and strains in the home and that certain things happened that were detrimental to the best interests of the child, Martin Emery, but this proof fails to support the allegations to the extent that it would be clearly indicated that the child suffered to the point that it would come within the provisions of said section. An abrogation of the adoption is solely a creature of, and regulated by statute law and, therefore, must be strictly construed. (Matter of Eaton, 305 N. Y. 162; Matter of Our Lady of Victory Home, 126 Misc. 112.) It well might be, without regard to the rights under section 118-a of the Domestic Relations Law on the appli *237 cation for the abrogation of the adoption, that the natural mother of this child, Gun da Macan, would have a right under a habeas corpus proceeding to seek to regain custody of her child. The court having that in mind, it is well to clarify at this time and pass upon the question that would then arise as to what would be for the best interests of the child. In the final analysis this should be a determining factor in all cases involving the custody of children. It has been stated that the child’s welfare may never be forgotten or disregarded, and the court should consider in that connection if it is to the child’s best interests that he be raised by his natural parent.
Martin Emery Jeffrey has been reared and cared for by his foster mother from a very tender age to the present time, and by reason of the complications in the marriage between his foster mother and natural father, he has been subjected to many emotional disturbances. At the beginning of this proceeding he was seeking a sympathetic comfort with his brother as they attended the same school, and though at that time there was no expression of disloyalty to his foster mother, he was claiming an intense desire to live with his brother. This attitude has now changed to one of intense loyalty and determination on his part to remain with his foster mother. The court has knowledge that during the period of the trial and disposition of this matter there has been considerable influence unquestionably, brought upon the child, Martin Emery, in trying to influence his own decision and opinion in this matter. In one instance unquestionably, the foster mother and Martin Emery have discussed this situation as to the changes he would face if he lived in the home of his natural mother, and on the other hand, his father and his brother, John, have brought about persuasion that his decision should be favorable to coming into the home of his natural mother, where he could be with his brother and his half-brother and the complete family unit. During this period of conflict Martin Emery has been free from the emotional conflicts in the home by the separation of his natural father and his foster mother. TTis marks in school have improved substantially. He seems to have grown in maturity and has confidence in the decision he has reached as far as his own preference is concerned in this particular situation and under influences of this conflict. The preferences expressed by a child may be considered by the court, but the court is not necessarily to be guided by them. That would in itself be substituting the discretion of the child for the discretion of the court, and many times the wishes of children are expressed because of certain influence brought about by situations with which they find themselves surrounded, or by selfish *238 motives of one or other or both of the parents. (People ex rel. Geismar v. Geismar, 184 Misc. 897; Matter of Jiranek, 183 Misc. 704, mod. 269 App. Div. 709.)
The court does not presume to lend itself in the determination of the matter solely upon the wishes of the child, Martin Emery. If the court were so disposed, it might be influenced by his wishes at the beginning of this proceeding to live with his brother, and at the conclusion thereof to remain with his foster mother. Martin Emery has had many emotional impacts upon his life — in his very tender years with his natural mother and then his later years in the home of a foster mother during the period of the marriage with his natural father, Walter Jeffrey, in which there were great conflicts and instability. The boy is happy under the existing conditions; his natural father is free from the home; the home has been stabilized; it is good and adequate. Martin is making great progress in school. He seems to be a well-mannered, healthy, normal boy, who is mature beyond his years unquestionably, brought about by the conflicts in his life.
Referring to the evidence and the report of Dr. Waldemar H. Boldt, the psychiatrist — his concluding statements and remarks indicate strongly that this child should not face the further emotional upset of being transferred from the home that he has known since his infancy, in which he has lived as an only child for a number of years, to a different home where he would have to make an adjustment with his natural mother, whom he has not known too well, and with his stepfather, with whom he is not well acquainted, and in a home environment that would place him in competition with his brother, John, and his younger half-brother.
In the best interests of the child, Martin Emery, it would seem to the court that the parental rights must give way under the circumstances, and that he should remain with his foster mother, where his present adjustment has been excellent and where he is now doing so well. Certain changes might take place that would and could change the existing situation, and it is believed by the court that the child, Martin Emery, can best be protected by a continued supervision through the court of the care and rearing of this child. The custody of infant children is not to be shifted from parent to parent merely because a noncustodial parent has experienced improvement in conditions, status or character. At least this is true so long as the custodial parent has not been shown to be unfit, or perhaps less fit to continue to serve as the proper custodian. (Matter of Lang v. Lang, 9 A D 2d 401, 409.)
*239 The court feels that no order should be entered at this time denying the application or granting the application, but that judgment on the petition should be held suspended and supervision of the care and control of said infant, Martin Emery J eff rey, should be continued through this court with the assistance of the Probation Department of Broome County, with periodic visitations to assure that the child’s welfare, need, rearing and care are being fully met. This procedure may be somewhat unusual and unorthodox, but it seems to the court that in this particular type of case, where there is clear evidence of strength and weakness of the parties involved in their respective homes, there is a continued need for direction and supervision; that time changes the existing conditions and that a permanent judgment at this time cannot contemplate what the change of these conditions might be.