MAGER, Judge
(dissenting):
The decision of the majority which has approved the taking of the custody of three minor children from their natural mother does not comport with my understanding of the law, the evidence in this case or my sense of justice. Over twenty-five years ago one of our sister state courts made some observations which are particularly appropriate:
“Above all, the question here, as already observed, is not one of abstract morals, but rather whether the mother’s indiscretions have been such as to affect her right to custody; whether the welfare of the children has been or will be harmed thereby. The law is not so vengeful as to punish the children through their mother.
“Since we are dealing with humans and not angels, we must take human frailties into account. Granted that the mother is not perfect, still, imperfection is not unfitness. And if we rejected anything short of flawlessness, oiir quest would have to go beyond and higher than this earth. .
“Let it be distinctly understood, however, that this finding is in no sense to be interpreted as an approval or condo-nation of the mother’s behavior. Such, indeed, is not the precise question before the Court. This is not a divorce action, calling for a branding with the scarlet letter. For the Court to assume a sanctimonious or puritanical attitude would not be realistic; it would not meet the practicalities here presented. A system of justice not seasoned with compassion and understanding would be unjust. A blind and merciless casting of the first stone is not the mission of the law." (People ex rel. Geismar v. Geismar, S. Ct.N.Y., 1945, 54 N.Y.S.2d 747, at 755, 756.) (Emphasis added.)
The dissolution of a marriage is rarely free from difficulty particularly where custody of children is involved. In this sense dissolution presents a paradox. While it marks the end of the marital union and seemingly seeks to bring to a close those issues which caused the dissolution, oftentimes this termination is just the beginning of another dilemma where the custody of children is an issue.
It would be ideal if a court possessed a judicial crystal ball to enable it to gaze into the future and determine the wisdom and correctness of a custody award. The courts, however, are not oracles. Instead, the court is invariably faced with the practical realities of the situation guided by a sometimes nebulous undefined principle, namely, the welfare of the child. This principle, then, is the polar star in resolving the question of custody.
Once again this vexing problem is revisited and the court, must ascertain whether the polar star has been correctly illuminated and applied.
With this being the paramount consideration, judges from time immemorial have agonized over the question of whether to remove a child from the custody of its natural mother. See Klein v. Klein, Fla.App.1967, 204 So.2d 239.
As was so aptly pointed out in a recent decision of the Supreme Court of Nebraska, in Fisher v. Fisher, 1970, 185 Neb. 469, 176 N.W.2d 667, at p. 670:
“ . . . There is no certain yardstick by which the best interest of the children can be measured. The problems resulting from a broken home arise through no fault of the children and a court in attempting a decision that is cal *593 culated to do the least harm to the children is surrounded by uncertainties and emotional considerations that try the conscience of the court.”
In the case sub judice the plaintiff-wife on February 24, 1970, filed an action for divorce against defendant-husband on the ground of extreme cruelty. On September 12, 1970, the wife was granted the divorce and given custody of the three minor children.[1] At the time of the divorce the ages of the children were one, two and three years. In the final judgment of divorce the chancellor made two significant findings: The court found that the wife was a fit and proper mother and that it was in the best interests of the minor children that the mother have and retain exclusive care, custody and control subject to visitation rights; the court also found that the wife had shown by substantial competent and corroborative evidence that the husband was guilty of extreme cruelty toward the wife during their marriage.[2] The husband did not actively contest the divorce nor is there any testimony whatsoever, prior to the granting of the divorce, that the husband sought or desired custody of the minor children.
On October 16, 1970, slightly more than one month after the divorce was granted, the husband filed a petition seeking modification of the custody award, alleging that a deposition taken of the wife on August 17, 1970, revealed that the wife had frequent sexual relations with one Roger Moore prior to the filing of her complaint and during the pendency of the divorce proceedings. The husband’s petition alleged that the sexual misconduct occurred at the wife’s residence while the children were under the same roof. The husband further asserted that he had not been apprised of the contents of the deposition of August 17 prior to the granting of the divorce; that the deposition was never transcribed and that the court at the final hearing was never advised or had the opportunity of considering this evidence. The record is vague and conspicuously silent regarding the reason why the contents of this deposition were not made known to the husband or to the court.[3] The record does indicate that the deposition was transcribed on October 1, 1970, some 15 days before the husband filed his petition for modification. On December 9, 1970, a chancellor other than the one granting the original divorce heard testimony in connection with the husband’s petition for modification. At this hearing the wife confirmed the statements made in her deposition and candidly admitted having had sexual relations with Roger Moore during the aforementioned period. The evidence at this hearing also indicated that these relations occurred with some degree of frequency between January and August, 1970, and further that the said Roger Moore spent *594 more than an infrequent night at the wife’s home during the months of September and October, 1970, which was at a time subsequent to the entry of the final decree for divorce. The record further reveals that on November 14, 1970, prior to the modification hearing, the wife married Roger Moore.
After hearing the evidence and testimony of witnesses called by the husband and the wife the trial court found that the wife was an unfit mother and awarded custody of the three minor children to the husband directing the wife to vacate the former home of the parties.
There is a distinction between an award of custody made in a final decree of divorce and an award made subsequent thereto pursuant to a request for modification. This distinction is ably set forth in Doran v. Doran, Fla.App.1968, 212 So.2d 100, at 105:
“An award of custody in a final decree of divorce is to be regarded as res judi-cata as of the time of the decree, and after the right to custody has thus been fixed by the divorce decree in one parent, on consideration of a subsequent petition for a change of the custody the court does not have the same degree of discretion to choose between the parties regarding the matter of custody, as it had on the occasion of the initial custody determination made in the final decree of divorce. Thus, on petition for modification, the court is not warranted in making a change in custody unless there has been a substantial change in conditions and circumstances since the date of custodial decree or unless there is presented pertinent facts which were in existence at the time the decree was entered but which were unknown to the court at that time. Even if the court finds a substantial change in conditions a decree should not be altered unless the welfare of the children would be promoted.” (Emphasis added.)
It is apparent that once the initial determination of custody is made, the burden is on him who would change it to present a reason in the form of some change in conditions. Doran v. Doran, supra. See also Frye v. Frye, Fla.App.1967, 205 So.2d 310. As a general rule the conditions giving rise to modification invariably relate to those facts and circumstances occurring subsequent to the date of the original award; an exception to this principle exists where the pertinent facts, although in existence at the time the decree was entered, “were unknown to the court at the time”. Doran v. Doran, supra. This exception is premised upon the proposition that the doctrine of res judicata is not to be rigidly applied in a custody situation since the welfare of a child is the paramount and overriding consideration. Klein v. Klein, supra.
Therefore, insofar as it related to a change of custody it was appropriate for the trial court to consider the conduct of the wife as it existed prior to the entry of the final divorce decree where such conduct was unknown to the court at the time the decree was entered. Weatherall v. Weatherall, Okl. 1969, 450 P.2d 497. See also Meadows v. Meadows, 1919, 78 Fla. 576, 83 So. 392. The record, however, additionally indicates that some of the wife’s misconduct occurred subsequent to the entry of the final decree.
The question to be determined in this appeal is whether the prior adulterous behavior and subsequent misconduct renders a wife an unfit mother, i. e., whether misconduct per se constitutes a sufficient reflection on a parent’s fitness to have custody of a child. This question is one that is not easy to answer because no hard and fast rule can be laid down as to what misconduct is deemed to be of sufficient gravity as to bear upon the welfare of the child. Each case must be determined upon its own peculiar facts and circumstances.
The courts have with increased frequency awarded custody of minor children to the erring mother. The basis therefor is *595 comprehensively discussed in an annotation in 23 A.L.R.3d 6, at pp. 15-16, entitled “AWARD OF CUSTODY OF CHILD TO PARENT AGAINST WHOM DIVORCE IS DECREED”:
“ . . . There are, of course, many reasons for favoring the mother in custody cases. The most important one is simply the pragmatic consideration that the wife and mother appears better fitted, naturally and socially, to take care of the children herself, a consideration which increases in importance as the age of the child decreases. This emergence of the mother as the preferred custodian of the children is fortified by findings of child psychologists, psychiatrists, and social workers who have come to the conclusion that the child’s welfare is best served in a majority of cases by awarding the custody to the mother. Thus, in actuality, the question at present is not any longer whether the father or mother has preferential rights to the custody of the child but only whether the welfare of the child is endangered by an award of custody to the mother in preference to the father. From this historical analysis it would follow that the guilt of the mother in the divorce proceedings cannot play a major role in current cases as a factor in a ctistody award. . . . ” (Emphasis added.)
It is particularly significant that the award of custody to the mother has been favored even in those cases where the husband was granted a divorce based upon the wife’s adiilteroiis conduct. 23 A.L.R.3d, supra, 9-121. In the case sub judice it is to be recalled that the wife was granted the divorce based upon the husband’s extreme cruelty. This distinction is noted even though it is recognized pragmatically that a wife’s misconduct subsequent to an award of custody is analogous to prior adulterous conduct culminating in a divorce insofar as the ultimate determination of custody is concerned.
In resolving the vexing problem of the welfare and best interests of the child the most singular and important factor is the relative fitness of the parents to care for the child. All cases seemingly agree that the guilt of one of the parties while a factor to be taken into consideration in determining the custody award is considered “only to the extent that the guilt reflects upon the guilty parent’s fitness to have custody of the minor child and not as an independent factor automatically bearing on an award of custody to the parent found guilty of marital misconduct.” 23 A.L.R.3d, supra, 17. See also Silberman v. Katcher, Fla.App.1968, 214 So.2d 726. In other words, the fact that a mother may be an unworthy or unfit wife does not mean that she is automatically an unworthy or unfit mother. We should be mindful of the fact that marital misconduct can be an offense against the other party to the marriage without necessarily being an offense against the child. Dearden v. Dearden, 1964, 15 Utah 2d 105, 388 P.2d 230. The indiscretions are not to be judged from a purely moral standpoint but rather from the standpoint of the relationship of such conduct to one’s fitness as a mother.
Marital misconduct in relation to an award of custody has been given substantial treatment by the courts in this state. A thorough discussion of some of the pertinent cases appears in McAnespie v. McAnespie, Fla.App.1967, 200 So.2d 606, where our courts have adhered to the principle that a mother who is guilty of adultery is not necessarily disqualified to have custody of her children. Quoting from McAnespie, at page 609:
“ . . . Although she may have been a bad wife, she may be a good mother. The moral fitness of a mother must be such as has a direct bearing on the welfare of the child, if it is to deprive her of the custody of the child.
ft i}c * *
“Although it is said in some other cases, that, other considerations being equal, it is usual to award the custody of the children to the innocent spouse, a survey of *596 the results of a large number of cases reveals that this is not the practice in the majority of the states. Even though a father obtains a divorce, the preference of the mother as the custodian of a child of tender years persists where her fault does not reflect upon her present fitness to raise the child. Notwithstanding the conduct of the mother, the welfare of the child may be best served by awarding it to her; and this welfare can be determined to some extent by the comparative acts of the father and mother, showing love and affection for it and a parental interest in its welfare.” (Emphasis added.)
The decision by the Florida Supreme Court in Widett v. Widett, Fla.1956, 88 So.2d 769, affirming an award of custody to an adulterous wife is particularly pertinent because the situation there was far more extreme than in the case sub judice. The late Mr. Justice Glenn Terrell, in adopting the findings of the chancellor, stated, at p. 770:
“The proof is clear that she committed adultery not only with one man, hut with several others at various times and places. Her conduct, without attempting to recite it here, evidences that she was wholly without any good faith in resuming the marital relations with her husband. She has intentionally failed to treat him with conjugal kindness, since they resumed marital relations.
“Upon the proof, she is guilty of adultery, which has not been condoned. She is also guilty of extreme cruelty. She is entitled to no alimony.
“No useful purpose would be served in reciting the evidence upon which the court bases the conclusion that she is quite unfit to have the custody of the child. This is disclosed by the record.
“The father is a fit person to have custody. But, regardless of that, the father has no home in which to raise this girl, except with hired help in complete charge during his many absences.
“One must hope that the mother will change her ways upon the entry of this decree and that she will provide the care, affection and wholesome atmosphere that this girl is entitled to in her childhood days. Reluctantly, the Court determines that the welfare of the child requires her present custody with her mother.” (Emphasis added.)
Cf. Bennett v. Bennett, Fla.App.1962, 146 So.2d 588.
Again, we must observe that the distinction between the facts in the case sub jud-ice and the facts present in those cases hereinabove cited, particularly with respect to the fact that in those cases the wife was awarded custody of the child notwithstanding she had been the guilty party in the divorce proceedings.
While it is clearly recognized that each case must be determined upon its own particular facts and circumstances there is a marked similarity between the facts of the case sub judice and those considered by the Court of Appeals of Kentucky, in Hager v. Hager, Ky.App.1949, 219 S.W.2d 10. Briefly, there the father was granted a. divorce and awarded custody of a minor child based upon the adulterous conduct of the wife. Certain of the acts of indiscretion committed by the wife were with a man she subsequently married after her divorce. In reversing the award of custody to the father the court held that the acts of indiscretion by the wife with a man she soon married after she was divorced did not brand her as a person unfit to have custody of a young child where there is no evidence of promiscuity. The Kentucky appellate court observed, at page 12:
“ . . . It is difficult for society in general, and men in particular, to realize that a woman can reform and that one misstep on her part should not brand her as morally unfit to rear her child, *597 and that nothing is left to her but the downward path to perdition. The male of the species seems to think that to him, and him alone, is reserved the right to sin, followed by forgiveness and restoration to his place in our social system. Such is not, and should not be, the moral code of a cultured people.”
See also Wilcox v. Wilcox, Ky.App.1955, 287 S.W.2d 622.
A review of the record below indicates that the sole basis for modifying the original custody award was the misconduct, per se, of the wife rather than her unfitness as a mother. This is clearly revealed in the record of the proceedings at the hearing for modification when the trial court observed in part.
“THE COURT: . . . There has been no issue in the case that they offer as to Mrs. Moore’s fitness as a mother on any ground at all except as to her relationship with Moore. And I presume that it is conceded, at least there is no evidence otherwise that she has not cared for the children physically and so forth, provided them with the necessary food and shelter and all of that. So if the testimony is going to be in that vein I would ask counsel on the other side, you haven’t offered any testimony otherwise?
“MR. EWALD: I believe that Mr. Smothers in answer to a question said that in most times she took good care of the children on an everyday household type basis.
“THE COURT: The change and condition goes only to her relationship with Moore. And I’m prepared to hold that she is otherwise, other than as to that relationship a fit mother on the basis of what is here now. He stipulated at the other hearing that she was so. I don’t see any point in putting on a lot of testimony in that line.”
While the order of modification contains no findings of fact in support of the determination that the wife was an unfit mother, the transcript of the court’s ruling reveals the basis for the court having found that the wife was an unfit mother:
“The Court finds that the plaintiff did reside in her home with her children with Roger Moore for a period of time beginning immediately after the final judgment in this case on a continuous basis until such time as the petition to modify was filed in this case, and then thereafter on a continuous basis more or less. That the exposure of the children during that time that she and Roger Moore regularly had sexual relations— that the exposure of the children and her adulterous conduct was about as much as can be under ordinary circumstances because they wouldn’t ordinarily open up the door and say you young ’uns come on in here. The children were exposed to this situation where a man, not married to their mother was living in the house with them. And that’s about as much exposure as can ordinarily be done.”
The evidence in the record does not support the findings of the trial court that the wife is an unfit mother. It is recognized that the trial court was presented with a perplexing problem and undertook to perform a Herculean task in a most conscientious and sincere manner. In this context we should not be unmindful of the presumption of correctness accorded to the findings of a chancellor and as a corollary the reluctance of an appellate court to disturb a decree on the facts. Where, however, the decree is against the clear weight of the evidence or is induced by an erroneous view of the law, such decree cannot remain undisturbed. Sponholtz v. Sponholtz, Fla.App.1964, 180 So.2d 497; Town of Medley v. Seminole Rock Products, Inc., Fla.App.1962, 138 So.2d 534; Joannou v. Joannou, Fla.App.1960, 117 So.2d 40.
In reviewing the record, I am of the opinion that the decree is against the clear weight of the evidence and was predicated *598 upon an erroneous view of the law. Alfonso v. Alfonso, Fla.App.1971, 254 So.2d 846. Moreover, the husband has failed to show such a substantial change in conditions and circumstances as would warrant the trial court making a change in custody; nor does the record demonstrate that the welfare of the children would be promoted by such a change in custody.
Furthermore, it is my humble opinion that the decree and the decision of the majority conflicts with the overwhelming de-cisional law in this and our sister states.
I wonder, too, whether the decision of the majority has in effect forever foreclosed the natural mother regaining custody of her children. If the misconduct of the mother with a man whom she has subsequently married precludes her now from having custody of her children, what possible change in circumstances can the mother ever present to a court at some future time that would prove her fitness ?

. Certain awards of real and personal property were made pursuant to the stipulation of the parties including the granting to the wife of the use and occupancy of the jointly held marital dwelling.

. The evidence in the record is undisputed that the husband physically abused his wife.

. The transcript of the proceedings of the divorce action reflects, with some degree of certainty, that the attorneys for both the husband and the wife were aware of the contents of the deposition. This is particularly borne out by the fact that the attorney for the wife withdrew a claim for alimony based upon the contents of such deposition. Additionally, testimony of the husband at the modification hearing reflects that he had “suspicions” that his wife was having an affair with another man-which he claimed he could not prove. Although an attorney’s knowledge is imputed to his client from which it can be reasonably concluded that further consideration of the matters contained in the deposition would be foreclosed at the modification hearing, there are other compelling reasons for minimizing the effect of the attorney’s knowledge and the client’s “suspicions”. It is to be additionally noted that at the modification hearing the husband was represented by an attorney other than the one representing him in the divorce proceedings.